TRAFALGAR HOUSE CONSTRUCTION, INC., Plaintiff,

v.

The UNITED STATES, Defendant.

No. 99–363C.

United States Court of Federal Claims.

Oct. 31, 2006.

Norman T. Daniels, Jr. and Carl L. Fletcher, Jr., Daniels Law Firm, P.L.L.C., Charleston, West Virginia, Counsel for Plaintiff.

Brian S. Smith, United States Department of Justice, Washington, D.C., Counsel for Defendant.

## MEMORANDUM OPINION AND ORDER

BRADEN, Judge.

To facilitate a review of this Memorandum Opinion and Order, the following outline is provided:

I. RELEVANT FACTS. [677]
    A. In 1986, The Government Initiated A Plan To Construct A Job Corps Center In Charleston, West Virginia. [677]
    B. On September 7, 1994, The Government Issued A Solicitation To Construct The Job Corps Center. [678]
    C. On March 20, 1995, The Government Awarded Plaintiff A Contract To Construct The Job Corps Center. [678]
        1. The Contract Contained Certain Definitions And Terms.
        2. The Contract Incorporated Certain Federal Acquisition Regulation Provisions.
        3. The Contract Incorporated Contract Drawings And The Project Manual.
        4. The Contract Incorporated Two Geotechnical Reports.
    D. Plaintiff Solicited Subcontractor Bids For The Earthwork. [681]
    E. Problems At The Construction Site. [682]
        1. Bedrock Was Encountered At Lower Elevations Than Depicted In The Contract Drawings.
        2. Uncontrolled Fill Was Encountered.
        3. The Amount Of Special Rock Fill On Site Was Not Sufficient.
        4. The Sequence of Construction Was Disrupted.
    F. Plaintiff's Requests For Equitable Adjustment. [685]
        1. On April 5, 1996, Plaintiff Filed A Request For Equitable Adjustment.
        2. In September 1997, Subcontractor Kimberly Industries, Inc. Retained A Consultant To Review The Contract's Requirements.
        3. On August 20, 1998, Plaintiff Filed A Revised Request For Equitable Adjustment.
    G. The Contracting Officer's Review Of Plaintiff's Requests For Equitable Adjustment. [687]
        1. The Contracting Officer Retained Warner Construction Consultants, Inc. To Evaluate Plaintiff's Request For Equitable Adjustment. [690]
        2. The May 14, 1999 Contracting Officer's Final Decision.
            a. Findings Regarding Subcontractor, Kimberly Industries, Inc.
            b. Findings Regarding Plaintiff.
    H. The Civil Case In The Circuit Court Of Kanawha, West Virginia. [690]

II.  PROCEDURAL HISTORY. [691]

III. DISCUSSION. [692]
    A.  Jurisdiction. [692]
        1.  Requirements Of The Tucker Act.
        2.  Requirements Of The Contract Disputes Act.
           a.  Plaintiff's April 5, 1996 And Revised August 20, 1998 Request For
               Equitable Adjustment State A "Claim."
           b.  Plaintiff's Certification Of The Request For Equitable Adjustment
               Was Technically Deficient.
           c.  Plaintiff's Subcontractors Are Not Authorized To File A Certification.
    B.  Standing. [697]
    C.  Standard For Decision Regarding A Differing Site Condition. [698]
    D.  The Court's Disposition Of The Government's Motion For Judgment On
        Partial Findings. [698]
        1.  On Plaintiff's Claim For Encountering Bedrock Lower Than Indicated.
           a.  Plaintiff's Argument.
           b.  The Government's Response.
           c.  The Court's Resolution.
        2.  On Plaintiff's Claim For Removing Uncontrolled Fill.
           a.  Plaintiff's Argument.
           b.  The Government's Response.
           c.  The Court's Resolution.
        3.  On Plaintiff's Claim For Providing Special Rock Fill.
           a.  Plaintiff's Argument.
           b.  The Government's Response.
           c.  The Court's Resolution.
        4.  On Plaintiff's Claim For Project Delays On Account Of Site Conditions.
           a.  Plaintiff's Argument.
           b.  The Government's Response.
           c.  The Court's Resolution.

IV.  CONCLUSION. [704]

* * *

## I.  RELEVANT FACTS.[1]

### A.  In 1986, The Government Initiated A Plan To Construct A Job Corps Center In Charleston, West Virginia.

In 1986, the Department of Labor ("Government" or "DOL") began to search for a suitable site to construct a new Job Corps Center in Charleston, West Virginia. *See* TR 80–81. In 1992, the Government contacted a local developer, John Wellford, to explore placing the Job Corps Center adjacent to an office park that he was developing in Charleston. *See* TR 80–82, 306. Mr. Wellford did not want the Job Corps Center to be constructed in that location but offered to assist in identifying an alternative site. *See* TR 81, 306–07. Mr. Wellford identified another property, on top of a mountain, on the outskirts of Charleston. *See* TR 81, 304. This property was purchased by Corotoman, Inc. ("Corotoman"), a land holding company owned by Mr. Wellford. *Id.* Thereafter, Corotoman sold twenty-four acres of property to the city of Charleston, which, in turn, sold the land to the Government as the site of the proposed Jobs Corps Center. *See* TR 83, 304. Kimberly Industries, Inc. ("Kimberly") constructed a road to the site and installed sewer and water lines. *See* TR 83–84. Mr. Wellford also was the President of Kimberly. *Id.* at 80.

On March 4, 1993, the Government entered into a contract with ZMM, Inc. ("ZMM") to provide architectural and engineering services for the Job Corps Center project. *See* TR 109. ZMM contracted with Chapman Technical Group ("Chapman") to provide nec-

1.  The relevant facts recited herein were derived from: Plaintiff's Exhibits ("PX 1–126"); Defen-dant's Exhibits ("DX 1–5"); and the transcript of the September 19–23, 2005 trial ("TR 1–1207").

essary civil engineering services. *See* TR 573–74. Chapman contracted with H.C. Nutting Company ("H.C.Nutting") to conduct a geotechnical investigation of the site. *See* TR 574. In addition, DMJM/HTB Inc. was hired to provide engineering support and develop the scope of work. *See* TR 21, 1030–32.

The initial Job Corps Center's schematic site plan included eleven one– and two-story buildings, some hanging over steep slopes, without a perimeter roadway. *See* PX 3 (Project Plans and Drawings); PX 8 at 4. ZMM, however, determined that the level area on top of the mountain was not large enough to accommodate this plan, so the flat area was proposed to be increased by designing "sidehill fills" around the perimeter. *See* PX 3 at 16–25 (cross-sections of the project site depicting the existing grade and the proposed grade); *see also* PX 1, part 6 at 99–105/121 (six drawings of sidehill cross-sections A–A through G–G, depicting the existing bedrock, the proposed slopes, required engineering fill, and required special rock fill).

**B. On September 7, 1994, The Government Issued A Solicitation To Construct The Job Corps Center.**

On September 7, 1994, the Government issued Solicitation No. IFB–95–DAA–03–JC, incorporating by reference certain plans, specifications, and other documents necessary to construct the proposed Job Corps Center, including contract drawings, a project manual, and two geotechnical reports. *See* PX 1; PX 3; PX 70 at 2. On December 12, 1994 and January 5, 1995, the Government issued two amendments to the initial Solicitation. *See* PX 1, part 1 at 2–3/160.

**C. On March 20, 1995, The Government Awarded Plaintiff A Contract To Construct The Job Corps Center.**

On March 20, 1995, the Government awarded Contract No. E–5019–5–00–82–20 ("the Contract"), at a fixed price of $17,270,000, to Trafalgar House Construction, Inc. ("THC") for the construction of the new Job Corps Center. *See* PX 2 at 1–3

(contract between THC and the Government).[2] The Contract required the construction of nine buildings, as well as site utilities, paving, and landscaping. *See* PX 70 at 1 n. 1, 3.

**1. The Contract Contained Certain Definitions And Terms.**

The Contract included the following definitions and terms:

1.3 DEFINITIONS

A. Excavation consists of the removal of material encountered to subgrade elevations and the reuse or disposal of materials removed.

B. Subgrade: The uppermost surface of an excavation or the top surface of a fill or backfill immediately below structures, subbase, drainage fill, or topsoil materials.

C. Borrow: Soil material obtained off-site when sufficient approved soil material is not available from excavations.

* * *

G. Unauthorized excavation consists of removing materials beyond indicated subgrade elevations or dimensions without direction by the Architect. Unauthorized excavation, as well as remedial work directed by the Architect, shall be at the Contractor's expense.

* * *

2.1 FILL MATERIALS

A. General: Provide approved borrow soil materials from off-site when sufficient approved soil materials are not available from excavations.

* * *

K. Random Fill: Random fill shall be considered as a mixture of any or all of soil, granular material, or soft shale and clays as described herein which are permitted by the Architect to be used in embankment and fills. These

**2.** The Contract initially was designated as Contract No. E–4112–3–00–82–10.

are materials that can be incorporated in a 6–inch compacted layer.

\* \* \*

L. Special Rock Fill: Special rock fill shall meet the general requirements of Item 704.5 of the West Virginia Division of Highways Standard Specifications and shall consist of as [sic] sandstone, siltstone and limestone which cannot readily be incorporated in a 6–inch compacted layer. Shale and claystone shall not be used.

Special rock fill shall be well-graded shot-rock having less than 20% passing the No. 4 sieve and less than 10% passing the No. 200 sieve.

The maximum allowed fragment size is 24‴ and platey fragments should be avoided. Special rock fill within the upper 12‴ below finished grade shall not exceed 18‴ in maximum dimension. A minimum shape ratio (defined as fragment length to width in any direction) of 3:1 is recommended. Special rock fill shall have a Slake Durability of $\geq 90$ and a jar slake category of 6.

PX 1, part 3 at 23–26/398.

The Contract also required that THC achieve substantial completion within 546 calendar days of receiving the Notice–to–Proceed ("NTP"). *See* PX 70 at 2. Final completion was to be reached within 658 days from receipt of the NTP. *See* PX 2 at 2; PX 70 at 2. THC received the NTP on April 10, 1995, setting October 8, 1996 and January 29, 1997 as the respective substantial completion and final completion dates. *See* PX 70 at 2.

### 2. The Contract Incorporated Certain Federal Acquisition Regulation Provisions.

In addition, the Contract incorporated Section 52.236–2 (Differing Site Conditions) of the Federal Acquisition Regulations ("FAR"), requiring that:

(a) The Contractor shall promptly, and before the conditions are disturbed, give a written notice to the Contracting Officer of—

(1) Subsurface or latent physical conditions at the site which differ materially from those indicated in this contract; or

(2) Unknown physical conditions at the site, of an unusual nature, which differ materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the contract.

(b) The Contracting Officer shall investigate the site conditions promptly after receiving the notice. If the conditions do materially so differ and cause an increase or decrease in the Contractor's cost of, or the time required for, performing any part of the work under this contract, whether or not changed as a result of the conditions, an equitable adjustment shall be made under this clause and the contract modified in writing accordingly.

(c) No request by the Contractor for an equitable adjustment to the contract under this clause shall be allowed, unless the Contractor has given the written notice required; provided, that the time prescribed in (a) above for giving written notice may be extended by the Contracting Officer.

(d) No request by the Contractor for an equitable adjustment to the contract for differing site conditions shall be allowed if made after final payment under this contract.

48 C.F.R. § 52.236–2.

The Contract also incorporated FAR 52.236–3 (Site Investigation and Conditions Affecting The Work), providing that:

(a) The Contractor acknowledges that it has taken steps reasonably necessary to ascertain the nature and location of the work, and that it has investigated and satisfied itself as to the general and local conditions which can affect the work or its cost, including but not limited to

(1) conditions bearing upon transportation, disposal, handling, and storage of materials;

(2) the availability of labor, water, electric power, and roads;

(3) uncertainties of weather, river stages, tides, or similar physical conditions at the site;

(4) the conformation and conditions of the ground; and

(5) the character of equipment and facilities needed preliminary to and during work performance.

The Contractor also acknowledges that it has satisfied itself as to the character, quality, and quantity of surface and subsurface materials or obstacles to be encountered insofar as this information is reasonably ascertainable from an inspection of the site, including all exploratory work done by the Government, as well as from the drawings and specifications made a part of this contract. Any failure of the Contractor to take the actions described and acknowledged in this paragraph will not relieve the Contractor from responsibility for estimating properly the difficulty and cost of successfully performing the work, or for proceeding to successfully perform the work without additional expense to the Government.

(b) The Government assumes no responsibility for any conclusions or interpretations made by the Contractor based on the information made available by the Government. Nor does the Government assume responsibility for any understanding reached or representation made concerning conditions which can affect the work by any of its officers or agents before the execution of this contract, unless that understanding or representation is expressly stated in this contract.

48 C.F.R. § 52.236–3.

### 3. The Contract Incorporated Contract Drawings And The Project Manual.

The Contract expressly incorporated the specifications and drawings prepared by ZMM and included in the Solicitation. *See* PX 2 at 2 ("10. The Government requires performance of the work described in these documents ... Specifications, Drawings, Addenda and Conditions as Prepared by ZMM, Inc., dated November 21, 1994. (See Section

C, Page C–1 for Information Pertaining to Specifications and Drawings.)").

Section C of the Contract, titled "Description / Specifications / Work Statement" provided:

Specifications: As prepared by ZMM, Inc., Dated: September 6, 1994, Labeled: "Project Manual—Charleston Job Corps Center, Volumes I, II and III," and containing bidding and contractual documents[.]

Drawings: As prepared by ZMM, Inc., Dated: September 6, 1994, and containing Sheets: Volume I—Cover Sheets / Legends; Landscape / Civil; Standard Architect, Mechanical, Structural, and Electrical Drawings. Volume II—Buildings A, B, C, D, E, F and G. Volume III—Buildings H, I, J and K.

PX 1, part 1 at 15/160.

Contract drawings showed lines indicating where the bedrock was to be located:

The results of the seismic study (Appendix D) indicate that though the thickness of overburden and weathered bedrock is variable, generally ranging between 4 and 14 ft., the topography of competent bedrock generally mimics the ground surface.... Seismic refraction analyses [sic] is a useful tool for defining general trends in bedrock topography and evaluating bedrock ripability. Nonetheless, the results of the seismic study are based on interpretation of remote sensing and can be affected by unseen factors such as discontinuous bedrock layering or the presence of high velocity layers over low velocity layers. It is noted that competent bedrock depths determined from test boring and test pit data were an average of approximately 2 ft. less than calculated from seismic data. Digitized seismic data on computer disk is available upon request from Berkshire Environmental Associates for incorporation into grading plans for estimation of rock quantities.

*Id.* at 23–24/160.

In addition, the Project Manual, referenced in the Solicitation and also incorporated into the Contract, contained the following instructions regarding excavation to subgrade:

3.7 APPROVAL OF SUBGRADE

A. Notify Architect when excavations have reached subgrade for evaluation of soil conditions.

B. When Architect determines that unsatisfactory soil is present, continue excavation and replace with compacted backfill or fill material as directed.

*Id.* at 29–30/160.

### 4. The Contract Incorporated Two Geotechnical Reports.

The Solicitation also incorporated two geotechnical investigations performed by H.C. Nutting. *See* PX 1, part 5 at 245/359; PX 1, part 6 at 1/121; PX 2 at 2. The first was dated October 26, 1993 ("Initial Geotechnical Report"). *See* PX 1, part 5 at 245/359. The second was dated June 21, 1994 ("Supplemental Geotechnical Investigation"). *Id.*, part 6 at 1/121.

The Initial Geotechnical Report discussed the depth of bedrock at the site:

It is our opinion that the site conditions are suitable for the proposed development. The proposed structures can be supported on firm natural soil, bedrock, or engineered fill. The depth to bedrock is generally shallow.

*Id.*, part 5 at 246/359.

\* \* \*

The proposed Job Corp Center site is characterized by generally firm natural overburden soils and shallow depth to bedrock.

*Id.* at 256–57/359.

\* \* \*

The sandstone and siltstone is generally well cemented and medium hard or hard.... The site is generally characterized by firm natural overburden soils and a shallow depth to bedrock.... Bedrock is shallow, therefore, special excavation techniques including blasting and rock trenching will be required for grading and placement of utilities.... Depth to bedrock is shallow, generally less than 5 ft.... More resistant sandstone and siltstone shot-rock should be reserved for use within the lower

portions and outer shell areas of proposed sidehill fill.

*Id.*, part 5 at 259–64/359; TR 175–76.

The Supplemental Geotechnical Investigation described the presence of uncontrolled fill at the construction site:

*Extent and Depth of [sic] Nature of Uncontrolled Fill Soils*

Our October 1993 geotechnical report described a partially filled swale which extended through the southeast portions of proposed Buildings I and D. Our February 1994 test pits indicated that the uncontrolled fill within this swale extended beyond the proposed building areas into the area of proposed sidehill fill. The depth of the uncontrolled fill within the swale exceeded 21 ft. at test pit TP–27, the maximum backhoe reach.

Our supplemental geotechnical investigation indicated the presence of a second buried swale within the northeastern portion of proposed Building H, and north adjacent side slope. Test pits TP–25 and TP–26, within this area, penetrated 5 and 15 ft., respectively, of uncontrolled fill. Fill soils less than 3 ft. thick are locally present in other areas of the site and were encountered at test pits TP–29, TP–35, and test borings BH–10 and BH–35.

As discussed in our October 1993 geotechnical report, the uncontrolled fill soil is predominately lean clay, clay, and fat clay. As an addendum, our supplemental geotechnical investigation indicates that wasted topsoil, logs, and other organic matter are present within the lower portions of the deeper fill areas at test pits TP–8, TP–9, TP–25, and TP–26. The thicknesses of organic uncontrolled fill soils range from 1 to 7.1 ft. The organic rich fill soils contain 5 to 8% organic matter by weight. Moisture content for the organic fills range from 24 to 29%. Moisture contents for other fill soils were variable and ranged from 13 to 33%.

*Id.*, part 6 at 11–12/121.

### D. Plaintiff Solicited Subcontractor Bids For The Earthwork.

THC solicited bids from subcontractors for the earthwork, including the sidehill fills and

utilities. *See* TR 88, 90, 99. In response, Kimberly, Battle Ridge Companies, and Kanawha Stone Company, Inc. submitted bids. *See* TR 90–91, 318–19.

Kimberly prepared a bid utilizing: the contract drawings, data from the Initial Geotechnical Report and Supplemental Geotechnical Report, test pits, and bore holes. *See* TR 91–92, 367–68. Kimberly interpolated the bore holes to estimate the quantity of rock that would be available on site as special rock fill. *See* TR 92–93, 333, 338, 347, 367–68. Kimberly, however, did not perform any independent sieve tests or slake durability tests on the rock contained in the borings or on rock from the project site. *See* TR 375–86. Kimberly calculated that 28,236 cubic yards of special rock fill would be required to prepare the project site. *See* TR 265, 341. Kimberly also estimated that approximately 79,000 cubic yards of rock would be available on site after excavation. *See* TR 331–35, 340–41. Of that available rock, Kimberly estimated that under a "best-case" scenario, approximately 60,000 cubic yards would be available to be used as special rock fill. *See* TR 446. Kimberly further estimated that under a "worst-case" scenario, approximately 34,000 cubic yards of special rock fill would be available at the site. *See* TR 340–43. Since Kimberly calculated that only 28,236 cubic yards of special rock fill were necessary, under either scenario Kimberly anticipated that adequate special rock fill would be available on site.

Kimberly's bid for the earthwork was $1,183,364, with anticipated completion of the work in 90 days. *See* PX 72 at 3, PX 82 (THC's bid book). Mr. Wellford testified that, while he did not personally prepare Kimberly's bid, he did review the bid and that THC asked "the typical questions" to confirm that Kimberly's bid was accurate and covered the "scope" of the project. *See* TR 329, 331–32. Kimberly's bid, however, was significantly lower than those submitted by Battle Ridge and Kanawha Stone. *See* TR 319. For example, Battle Ridge submitted a bid to THC of $2,570,538. *See* PX 80 (Bid from Battle Ridge Companies); *see also* TR 318–20. Kimberly's bid also did not include any cost to import engineered fill or special

rock fill to the Job Corps Center Site. *See* TR 129. In addition, Kimberly's bid also did not include any cost for removing uncontrolled fill below subgrade. *See* TR 170–71.

On April 10, 1995, THC selected Kimberly as the earthwork subcontractor for the Job Corps Center and provided Kimberly with a proposed contract. *See* PX 81 at 1/32 (subcontract between THC and Kimberly for the "[s]ite improvements, excavation, backfill, [and] utilities"). Kimberly and THC did not execute the April 10, 1998 proposed contract, but the company, nevertheless, began performing earthwork services shortly thereafter. *See* TR 425–29, 569–71.

### E. Problems At The Construction Site.

#### 1. Bedrock Was Encountered At Lower Elevations Than Depicted In The Contract Drawings.

On May 5, 1995, THC informed ZMM, in writing, that bedrock was encountered in Section A–A six to twenty-two feet deeper than indicated in the Initial Geotechnical Report. *See* PX 1, part 6 at 100/121; PX 87 (letter from THC to ZMM indicating lower bedrock in Section A–A and F–F); TR 118, 158–59. In Section B–B, Kimberly also encountered bedrock "as much as 31 feet" deeper than what was indicated in the Initial Geotechnical Report. *See* TR 158–60; PX 1, part 6 at 101/121. And, in Section F–F, Kimberly encountered bedrock ten feet deeper than was indicated in the Project Manual drawings. *See* TR 108–11, 157–58. Consequently, THC stopped excavation in these areas. *See* PX 87 ("As indicated in the attached letter from our subcontractor Kimberly Industries, we have moved our operations to another area pending formal direction on the scope of the proposed change by your design team."). ZMM, however, directed THC to continue excavating down to bedrock. *See* TR 109, 188–20. Kimberly had to dig an additional six to thirty-one feet further than indicated in the contract documents to reach the bedrock in Sections A–A, B–B, and F–F. *See* TR 109–10, 118–20, 158. As a result, increased quantities of engineered fill and special rock fill were required. *See* TR 118.

After encountering the bedrock problem, Kimberly and THC negotiated significant changes to the April 10, 1995 draft contract. *See* TR 427. For example, the April 10, 1995 draft contract provided:

> Subcontractor acknowledges that it has carefully read and understands the Contract, the Contract Documents, this Subcontract Agreement and the Project Plans and Specifications and Drawings, and is familiar therewith, and agrees to comply with and perform all provisions thereof applicable to the Subcontractor. Subcontractor further represents to have fully investigated the nature and locality of the Work and the Project site and the conditions and difficulties under which the Work shall be performed, and that it enters into this Subcontract Agreement based on its own independent examination, investigation and evaluation of all relevant details of the Work *and not in reliance upon any opinions or representations of Contractor, Owner or the Design Professionals, or any of such parties' respective officers, agents, servants, or employees.*

PX 81 at 2/32 (emphasis added). The final subcontract deleted the language italicized above and inserted:

> and not in reliance upon any opinions or representations of Contractor, Owner or the Design Professionals, or any of such parties' respective officers, agents, servants, or employees.

*Id.* at 10/32.

> The parties also deleted the following language from the April 10, 1995 draft subcontract:

> All Work shall be performed to the satisfaction of the Design Professionals, Owner and Contractor. The decision of the Design Professionals as to the true construction and meaning of the Project Plans and Specifications and Drawings shall be final and binding upon Subcontractor.

*Id.*

> Instead, the following language was substituted in the final version:

> All Work shall be performed to the satisfaction of the Design Professionals, Owner and Contractor in accordance with the con-

tract plans and specifications. The decision of the Design Professionals as to the construction and meaning of the project Plans and Specifications and Drawings shall be followed by Contractor and Subcontractor.

*Id.*

On June 9, 1995, Kimberly executed a final subcontract with THC to conduct the earthwork at the project site. *See* PX 81; TR 427.

### 2. Uncontrolled Fill Was Encountered.

Kimberly also encountered uncontrolled fill such as stumps, logs, trees, tires, and other debris up to thirty-five feet deep on the project site in the northern portion of Section A–A. *See* PX 99 (letter to DOL indicting that THC was "proceeding as directed with the removal of any uncontrolled fill"); *see also* TR 122–25, 135.

On June 13, 1995, THC sent a letter to advise the DOL's Contracting Officer, Mr. John Steenbergen ("CO"), that THC would be filing an equitable adjustment, because of the unanticipated removal of uncontrolled fill. *See* PX 99 ("Trafalgar House Construction is proceeding as directed with the removal of any uncontrolled fill when advised by your on site representatives. While THC agrees that it must perform this directed out of scope work, THC disagrees with any suggestion that work beyond the original lines and grades shall be at the Contractor's expense. Accordingly, this letter serves as written notification of THC's intent to request an equitable adjustment pursuant to Article G.13 of the Project Manual, specifically FAR 52.236–2 and 52.243–4, for anticipated additional costs and impacts related to this work. As this work progresses and costs/impacts can be determined THC will forward the information.").

On June 15, 1995, THC sent another letter to the CO to provide notice of the differing site condition encountered in Section B–B. *See* PX 100 ("This letter is to serve as written notification pursuant to Article G.13 of the contract documents, specifically FAR 52.236–2 and 52.243–4, of anticipated addi-

tional cost related to proposed changes, at the lower rock benches [B–B].").

On June 16, 1995, THC sent a letter to the CO detailing the additional costs incurred by Kimberly for the additional excavation required due to the lower bedrock encountered on Section F–F. *See* DX 2, file 14 "big red book" at 300/325. The letter requested a total of $32,736.03 for the "final costs" of this work. *Id.*

### 3. The Amount Of Special Rock Fill On Site Was Not Sufficient.

Kimberly initially estimated that 28,236 cubic yards of special rock fill would be required to prepare the project site. *See* TR 265, 341. Kimberly, however, found only 11,000 cubic yards of rock at the site that could pass the slake durability test, leaving a 36,000 cubic yard shortfall. *See* TR 129–34, 253, 349, 474–75.

On June 23, 1995, THC sent the CO a letter documenting the shortfall of special rock fill encountered. *See* PX 37 ("Additionally, the rejection of on site rock by ZMM/ H.C. Nutting for use in special rock fill has caused a shortage of material contemplated by the contractor at time of bid to be available on site.").

On June 27, 1995, Kimberly stopped work on the project to await further instructions regarding importing special rock fill. *See* DX 2, file 11 "ContractorProductionReports" at 60/453; *see also* TR 140–41, 493–95. At that time, approximately 70% of the earthwork was completed. *See* TR 514–15. On that date, the CO also directed THC to remove the uncontrolled fill:

> We have reviewed your correspondence and the contract documents, including the Geotechnical Report which was incorporated as part [d] the contract, and have verified that the contract requires removal of all uncontrolled fill from the site. Accordingly, we do not agree, based on the contract documents, that removal of the fill is a differing site condition subject to an equitable adjustment in accordance with Paragraph G.13 of your contract.

PX 40; *see also* TR 119–28, 294–96 (ZMM and H.C. Nutting's on site representatives

directed Kimberly how far down to dig when removing the uncontrolled fill). THC's bonding company also called Kimberly's bonding company and threatened to call Kimberly's surety bond, if Kimberly did not resume work. *See* TR 510–12.

In a July 18, 1995 letter, the CO directed THC to import special rock fill. *See* PX 48 at 2 ("It is ... the responsibility of the Contractor to provide ... special rock fill from off site if sufficient quality and quantities of this rock are not available on site."). In response, Kimberly initially contacted two companies to supply the special rock fill, Mazzella Quarries, Inc. ("Mazzella") and Martin Marietta Materials, Inc. ("Martin Marietta"). *See* TR 142. Mazzella was based in Charleston, but was unable to produce a sufficient amount of high-quality special rock fill. *See* TR 143. Martin Marietta could have shipped special rock fill by barge from Indiana, but Kimberly decided this would take too long. *See* TR 143–44. Instead, Kimberly searched for appropriate rock fill on a property adjacent to the project site owned by Corotoman. *See* TR 144–47, 299. Kimberly found suitable special rock fill at this location and developed a rock quarry and transported this special rock fill to the project site. *Id.* Kimberly did not resume work on the site until July 20, 1995. *See* DX 2, file 11 "ContractorProductionReports" at 60–81/453. Thereafter, Kimberly excavated below subgrade, as instructed, and removed 155,000 cubic yards of uncontrolled fill from the project site and then filled the hole with imported engineered fill and special rock fill. *See* TR 125, 131.

On July 28, 1995, the CO was advised that THC would be importing special rock fill from a local source that would arrive on or about July 31, 1995. *See* PX 54 ("In accordance with your direction, special rock fill is being mined off-site and deliveries of the material are expected to arrive starting July 31, 1995."); *see also* TR 150–51.

### 4. The Sequence of Construction Was Disrupted.

The lack of sufficient special rock fill on site required THC to rearrange the sequence of construction and add equipment and per-

sonnel to complete pads for the buildings as quickly as possible. *See* TR 236–50. On July 28, 1995, the CO was notified that THC was constructing buildings B, C, and E out of sequence. *See* PX 54 ("[P]lease be advised that Trafalgar House Construction is proceeding diligently with the Contract work at full capacity. . . . Stockpiled fill materials are being moved to allow for the out of sequence construction of Buildings B, C, and E."); *see also* TR 150. Nevertheless, THC represented that it still "intend[ed] to meet the contract completion date." *See* PX 54 ("By resequencing work activities and/or increasing manpower, Trafalgar House Construction intends to meet the Contract completion date."); *see also* TR 500. On February 22, 1996, THC informed the CO that completion of the project again would be delayed, but anticipated substantial completion of the project by January 21, 1997 and final completion by May 28, 1997, approximately four months behind schedule. *Compare* PX 66 ("[THC] presently projects substantial completion of the project on January 21, 1997, and final completion on May 28, 1997."), *with* PX 70 at 1 ("[The contract] established October 8, 1996 and January 29, 1997 as the respective substantial and final completion dates.").

In addition, the road around the perimeter of the project site, which was supposed to be completed before THC constructed the buildings, was not completed as scheduled. *See* TR 242–43. As a result, storm drains, electricity, and water also were not installed according to schedule. *Id.* By June of 1996, THC had completed the roof on Building H, Building D was started, and the perimeter road began to take shape. *See* TR 246. Even with extra equipment, however, Kimberly took two construction seasons to complete the site work, instead of the three months originally contemplated. *See* TR 250. THC achieved Substantial Completion on February 28, 1997, approximately four and one-half months after the deadline established in the Contract. *See* PX 70 at 2.

3. In a May 15, 1997 letter to THC's legal counsel, T.A. McMullen advised THC that:

Kimberly's, [sic] Request for Equitable Adjustment is grossly inflated. . . . It is my opinion that Trafalgar House should withdraw this Request for Equitable Adjustment prepared by Kimberly and formally direct them to revise their proposal in accordance with the guide-

## F. Plaintiff's Requests For Equitable Adjustment.

### 1. On April 5, 1996, Plaintiff Filed A Request For Equitable Adjustment.

On April 5, 1996, Kimberly and THC filed a Request for Equitable Adjustment ("REA") seeking $6,604,632. *See* DX 2, file 2 "REA_04–04–1996–Certified w KII and THC pages"; *see also* TR 486. Of that amount, $4,777,895 was requested for Kimberly and $1,826,737 was requested for THC, including commission and taxes. *Id.* at 11, 13/33. The REA was prepared for THC with the assistance of T.A. McMullen Consultants, Inc. ("T.A.McMullen"). *Id.* at 1/33; TR 486.

On December 2, 1996, auditors from the DOL's Inspector General's Office met with Kimberly officials to audit Kimberly's portion of the REA. *See* PX 70 at 3; *see also* TR 1047. At this conference, Kimberly provided the auditors an unsigned, 2–page Draft Summary Revised REA that increased Kimberly's portion of the claim to $5,586,230, but apparently this document was never submitted to the CO. *See* PX 70 at 3.

In February, 1997, the CO authorized a "provisional payment" of $1 million to THC. *Id.* at 6; *see also* TR 1051–52.

On February 19, 1997, THC submitted an "Update of the Cost Accounts and Schedule" to the CO, revising the April 5, 1996 REA to request total compensation of $7,232,922. *See* PX 70 at 6. Of that amount, $2,455,067 was requested for THC and $4,777,895 was requested for Kimberly. *Id.*

On March 5, 1997, Kimberly provided the DOL auditors with another revised "Draft Summary REA" in the amount of $6,329,543. *Id* at 4. This document, however, appears not to have been submitted to the CO. *Id.*[3] On April 21,1997, a final audit regarding the April 5, 1996 REA was issued. *Id.* at 19.

lines directed by the DOL audit. Under no circumstances should THC certify the REA with the Kimberly REA included in its present form. . . . I sincerely believe that if Trafalgar/Kvaerner advises Kimberly . . . on how to answer the audit they could become a part of assisting Kimberly in the preparation of a fraudulent claim.

**2. In September 1997, Subcontractor Kimberly Industries, Inc. Retained A Consultant To Review The Contract's Requirements.**

In September 1997, Kimberly hired Marshall Miller & Associates ("MM & A"), a geology and engineering consulting firm, to review independently the contract documents and "determin[e] ... the volume of special rock and engineered soil fill required under the contract performed by Kimberly." PX 125 at 4; *see also* TR 588–89, 594–96, 649–54. Over the next several years, MM & A prepared several reports for Kimberly. *See* PX 125 at Appendix A ("List of MM & A Reports"). Of particular interest are reports issued in February 1998, *"Special Rock and Engineered Soil Fill Requirements ● New Jobs Corps Center ● Charleston, West Virginia ● Kimberly Industries "* ("MM & A Report I"), *See* DX 2, file 11 "MM & A 2–6–98 report," and on November 11, 1999, *"Estimated Off-site and On-site Material Quantities, Charleston Job Corps Center"* ("MM & A Report II"). *See* PX 124.

In preparing MM & A Report I, Kimberly asked MM & A to "determine the volume of in-place, on-site rock suitable to meet the special rock requirements, calculate the volume of special rock required, [and] determine the volume of engineered soil fill material required at the site." DX 2, file 11 "MM & A 2–6–98 report" at 5/51. Kimberly also asked MM & A to "render opinions regarding the information and conclusions in the [H.C.] Nutting reports and typical industry practice in relying on such information in preparing a bid." *Id.*

MM & A Report I stated that:

Nutting concluded in their October 1993 [Initial] and June 1994 [Supplemental] reports of their geotechnical investigations that sufficient material existed on site to meet the special rock and engineered fill requirements required by the project plans and specifications.

Consistent with industry practice, Kimberly relied upon the statements in [H.C.] Nutting's reports to place the successful bid on soil and rock excavations at the site. A large volume of special rock was re-

quired for stabilizing slopes created by valley and side-of-hill fills constructed to achieve the site footprint. However, the actual volume of rock that met the special rock specifications was considerably less than alleged by [H.C.] Nutting. Kimberly was required to waste significant quantities from the site and to import rock from off the site to meet the fill criteria.

\* \* \*

In addition, a substantial volume of unstable fill, in existing valleys, was not identified in the [H.C.] Nutting reports or in the specifications.

\* \* \*

It is construction industry practice to rely upon engineering reports in specialized areas, such as geotechnical engineering, in preparing bids, and in complying with job specifications. The [H.C.] Nutting reports' [sic] concluded incorrectly that special rock fill was widely available on the site. A detailed geologic assessment and actual experience showed the opposite to exist, that only a minimum quantity of material suitable, as special rock fill was available on the site.

*Id.* at 5, 12/51.

MM & A Report I also concluded that the site contained "8,832 bcy of recoverable special rock material[.]" *Id.* at 12/51. This estimate was substantially lower than Kimberly's pre-bid estimate that it would recover approximately 28,000 cubic yards of special rock from the project site. *See* TR 714–16. MM & A explained that Kimberly's estimate was lower because of Kimberly's expectation that 75% of the excavated rock could be used as "special rock." *Id.*

**3. On August 20, 1998, Plaintiff Filed A Revised Request For Equitable Adjustment.**

On August 20, 1998, THC submitted a revised REA. *See* PX 67a (Joint Claim of Kimberly Industries, Inc. and Trafalgar House Construction, Inc. Job Corps Center, Charleston, West Virginia); *see also* PX 70 at 4 ("On August 20, 1998 ... Trafalgar submitted its certified claim, which again re-

DX 2, file 11 "Correspondence between TAM and    McManus" at 9–10/12.

vised the previously submitted REAs[.]").[4] The revised REA cited four changed conditions for which additional compensation was requested: (1) Lower Actual Bedrock Toe at Section F–F; (2) Lower Actual Bedrock Toe at Section A–A/B–B; (3) Major Underrun of Special Rock Fill Material; and (4) Removal/Replacement of Existing Uncontrolled Fill. *See* PX 67a at I–3. The revised REA requested total compensation of $14,481,291. *See* PX 67a at I–10b; PX 70 at 4. The revised August 20, 1998 REA also included claims from three subcontractors: Kimberly, Wayne Crouse, Inc., and Roth Brothers, Inc. *See* PX 67a at II–2b. THC summarized their claims as follows:

Figure 2.2.1—Subcontractor Impact Cost Summary

| DESCRIPTION | AMOUNT |
| --- | --- |
| Kimberly Industries, Inc. | $10,379,441.00 |
| Wayne Crouse, Inc. | 258,360.00 |
| Roth Bros., Inc. | 181,962.00 |
| TOTAL IMPACT COSTS | $10,819,763.00 [5] |

*Id.*

4. On March 2, 1998, T.A. McMullen raised renewed and other concerns over Kimberly's portion of the REA. First, Kimberly failed to carefully manage all Special Rock Fill that was excavated onsite. *See* DX 2, file 8 "TAM transmits Expert Opinion Report of 3–2–98 w exhibits" at 14/51 ("[P]rudence would require that all Special Rock Fill material excavated onsite be stockpiled as a reserve.... Project documents and Kimberly's jobsite diaries indicate that more than inconsequential quantities of rock and soil were hauled off to stockpile sites. There is no reconciliation of an allowance for these quantities in Kimberly's quantity calculations."). Second, T.A. McMullen expressed concern about Kimberly's failure to properly document "that massive amounts of excavated material were unsuitable for project embankments and backfills." *Id.* Third, there was an increase of over 300% between Kimberly's bid rate for excavation and the rate for excavation in the REA. *Id.* ("Kimberly's average bid rate for all excavation was $4.41 per cubic yard.... Kimberly's REA request averages $15 per cubic yard of excavation when all borrow quantities are included. If borrow quantities are not included, then the average rate ... swells to more than $21 per cubic yard. This disparity equates to four million dollars and is unreasonable."). An additional list of concerns challenged the integrity of Kimberly's portion of the REA:

1. Misstated bid quantity calculations and changed work calculations

## G. The Contracting Officer's Review Of Plaintiff's Requests For Equitable Adjustment.

### 1. The Contracting Officer Retained Warner Construction Consultants, Inc. To Evaluate Plaintiff's Request For Equitable Adjustment.

After receiving THC's April 5, 1996 REA, the CO contracted with Warner Construction Consultants, Inc. ("Warner") to assist in evaluating the REA. *See* TR 1042, 1129. John McTyre, Warner's Vice President, prepared most of Warner's analysis. *See* TR 1129; *see also* DX 1, file "Background–Summary of Opinions" at 1/3.[6]

Warner's Report concluded that:

• The bedrock in part of Section F–F was lower than indicated on sketches that were part of the Geotechnical Report. The Contractor should be reimbursed a fair and reasonable amount for the extra work required to deviate from what was shown on the sketch.

2. Failure to explain and justify recent increases in the Special Rock Fill material quantity by 53%, increases in the Random Fill borrow quantity by 46%, and increases in the Waste spoiled off site by 28%.
3. Revised planned limits of excavation
4. Failure to maintain accurate and validated cost accounts
5. Failure to control equipment utilization
6. Failure to responsibly delete unallowable or unjustified costs from REA requests
*Id.* at 15–16/51.

5. THC, however, calculated that *all subcontractor costs*, including commission, insurance, and taxes, totaled $12,245,807. *See* PX 67a at I–10b.

6. During trial, Plaintiff objected to Mr. McTyre being qualified as an expert witness on the subject of construction project costs. *See* TR 1127. The court viewed Mr. McTyre as a fact, rather than an expert witness. *See* Fed.R.Evid. 702; *see also Salem v. United States Lines Co.*, 370 U.S. 31, 35, 82 S.Ct. 1119, 8 L.Ed.2d 313 (1962) ("[T]he trial judge has broad discretion in the matter of the admission or exclusion of expert evidence[.]"); *see also General Electro Music Corp. v. Samick Music Corp.*, 19 F.3d 1405, 1409 n. 2 (Fed.Cir.1994) ("A decision to allow expert testimony is within the discretion of the trial court and will not be disturbed absent an abuse of such discretion.").

- The bedrock in the area where Sections A–A and B–B meet was lower than indicated on sketches that were part of the Geotechnical Report. The Contractor should be reimbursed a fair and reasonable amount for the extra work to deviate from what was shown on the sketches.
- The Geotechnical Report does not indicate that there should have been sufficient rock above sub-grade to satisfy the requirements for Special Rock Fill.
- The information presented in the Geotechnical Report was sufficiently clear that a competent earthwork contractor should have been able to evaluate the sufficiency or lack thereof of rock above sub-grade that satisfied the requirements for Special Rock Fill.
- There is no indication that the availability of rock actually encountered was significantly different than would be expected from a careful review of the geotechnical report.
- The contract documents are not sufficiently clear that the Contractor was responsible for the removal of "uncontrolled fill." The Contractor should be reimbursed a fair and reasonable amount for the cost of removing the "uncontrolled fill" and replacing it with engineered fill.
- The Contractor submitted (and the Architect approved) a plan (Baseline Schedule) that showed substantial completion by August 22, 1996—approximately one and a half months earlier than contractually required.
- The project was substantially completed on February 28, 1997, 190 days latter [sic] than planned.
- The Contractor's original plan for construction (Baseline Schedule) was altered because of the following issues:
  1. Contractor Shutdown
  2. Uncontrolled Fill Removal
  3. Undercut at A–A/B–B
- The Contractor resequenced construction with full knowledge of the scope of the above three issues so that Substantial Completion could still be achieved without delay to project completion (by August 22, 1996).
- The Contractor did not follow the resequenced construction plan and consequently incurred critical delay that prevented them from finishing footings for the then critical structure (Building I) before the onset of winter (1995–1996). At the conclusion of the winter (April 30, 1996) the project was delayed a total of 135 calendar days.
- The 135 calendar days were preventable if the Contractor had made a reasonable attempt to proceed in accordance with its resequenced construction plan and therefore the delay is inexcusable.
- The Contractor never provided a study or an evaluation of the causes of delay following April 30, 1996 and therefore the 55 days of additional delay are considered inexcusable.
- THC is not entitled to extended performance costs because delays to project completion are inexcusable.
- THC has not demonstrated that the change in sequence that the Government was responsible for resulted in significant extra costs.
- The use of a Total Cost Method of calculating damages for Kimberly Industries, Inc. (KII), the earthwork (sitework) subcontractor is inappropriate.
- The total amount of reimbursement that THC is entitled to for the site work issues is $543,514. This amount does not consider the amount that THC has already been paid by the DOL towards this claim nor does it consider the amount of the settlement with the design team.

DX 1 at 1–3/3; *see also* TR 1172.

## 2. The May 14, 1999 Contracting Officer's Final Decision.

On May 14, 1999, the CO issued a Final Decision regarding "Trafalgar House Construction, Inc. Claim Dated April 5, 1996, as Revised, Final Version, dated August 20, 1998." *See* PX 70.

The following chart summarized the REA claims and revisions:

SUMMARY OF REAs/CLAIMS SUBMITTED

| Date of Document | As Referenced in COFD * | Total $ Requested | Trafalgar | Kimberly |
|---|---|---|---|---|
| April 5, 1996 | Original REA | $ 6,606,632.00 | $1,826,737.00 | $ 4,777,895.00 |
| December 2, 1996 | 1st TCM REA ** | | | $ 5,586,230.00 |
| February 19, 1997 | 2nd THC/KI REA | $ 7,232,922.00 | $2,455,027.00 | $ 4,777,895.00 |
| March 5, 1997 | 2nd TCM REA | | | $ 6,329,543.00 |
| March 12, 1997 Miller Act Claim | Miller Act Claim | $ 8,641,094.72 *** | Kimberly = $6,505,327.86 Trafalg[o]r, Ltd. = $1,811,387.86 Corotoman = $1,400,164.00 | |
| August 20, 1998 | August 1998 Claim | $14,481,291.00 **** | $3,661,528.00 | $10,379,441.00 [7] |

*     COFD = Contracting Officer's Final Decision
**    TCM = Total Cost Methodology
***   Kimberly = $6,505,327.86 (less $1,075,785.00 advanced by Trafalgar, for a total of $5,429,542.86), plus interest; Trafalg[o]r, Ltd. (a Kimberly affiliate not associated with Trafalgar House Construction) = $1,811,387.86, plus interest; and Corotoman, Inc. (a Kimberly affiliate) = $1,400,164.00, plus interest.
****  Includes a $1,000,000 credit to the Government for an advance, and two additional subcontractors claims: Wayne Crouse-$258,360 and Roth Brothers, Inc.-$181,962.

PX 70 at 11; *see also* TR 1054.

### a. Findings Regarding The Subcontractor, Kimberly Industries, Inc.

The CO's Final Decision's findings regarding Kimberly's REA were:

> With respect to the additional work incurred by Kimberly for Section F–F, Section A–A/B–B, and Uncontrolled Fill, DOL determined that the additional work required resulted from a differing site conditions [sic] and, therefore, Kimberly is entitled to compensation.

> With respect to the additional SRF [Special Rock Fill], the DOL determined that this was not a cardinal change nor a differing site condition and, therefore, Kimberly is not entitled to compensation. The Contract documents, which include the specifications and geotechnical reports, did not specify the quantity of SRF which was available on site nor the quantity of SRF which would be needed. The contract documents did inform bidders that the basis for a bid was that the site was unclassified excavation. It also informed bidders about the nature of the subsurface condition.

> The documentation provided by Kimberly ... shows that a reasonable and prudent bidder would have estimated that there would be less rock fill, which met the requirements of SRF, available on site than would be needed for site work. Also, it is clear the [sic] Kimberly, in preparing its bid, did not reasonably estimate the amount of SRF that would be needed.

PX 70 at 3.

With respect to the compensation requested by Kimberly, the CO found that Kimberly's August 1998 claim for $10,379,441 lacked a sound accounting basis and appeared to be significantly inflated. *Id.* ("Kimberly's August, 1998 Claim of $10,379,441 appears to be based on a Total Cost methodology (total costs for performance less bid amount). A review of Kimberly's financial records by DOL [auditors] shows that the total costs incurred by Kimberly is $2,277,725."); *see also* TR 1059–60. The CO then calculated Kimberly's reimbursement based on "a unit price methodology, which identified quantities and unit prices for discrete activities." *Id.* This was the accounting methodology

7. In May 1998, Kimberly also may have submitted an amended REA to the auditors. *Id. See also* TR 1051 ("And there were revisions to the April '06 claim ... the final one came in May '98.") The May 14, 1999 Final Decision, however, does not reference any May 1998 revisions. *See* PX 70 at 3–5.

Kimberly used in the original, April 1995, REA. *Id.* Using this methodology, the CO determined that Kimberly was entitled to the following compensation:

| | |
|---|---|
| Section F–F | $ 47,967 |
| Section A–A/B–B | $193,103 |
| Additional Special Rock Fill (In addition to Sections F–F and A–A/B–B) | $ 0 |
| Uncontrolled Fill (In addition to Sections F–F and A–A/B–B) | $ 85,718 |
| **Sub-total** | $326,788 |
| Overhead (9.41%) | $ 30,751 |
| Profit (10%) | $ 35,754 |
| Bond/Taxes/Insurance/Permits | $ 12,618 |
| **Total** | $405,910 |

*Id.* at 3.

### b. Findings Regarding Plaintiff.

THC's August 20, 1998 claim sought $3,661,528 in compensation for THC. *Id.* The CO addressed the construction delays in three discrete periods of time: (1) April 10, 1995—August 31, 1995; (2) September 1, 1995—April 30, 1996; and (3) May 1, 1996—February 27, 1997. *Id.* at 4. For the first period of time, the CO apportioned blame for the delay between both DOL and THC. *Id.* ("The DOL is responsible for 58 days of non-critical delays (76%) and Trafalgar was responsible for 18 days (24%) of non-critical delay . . . . Therefore, any additional costs resulting from the resequencing should be apportioned accordingly (Trafalgar [24%] and the DOL [76%]).")." In the second period, the CO assigned all the responsibility for the delay to THC. *Id.* ("[F]or the second period of performance (September 1, 1995—April 30, 1996), Trafalgar is responsible for all of the 135 days of critical delay[.]"). The CO also concluded that THC was entirely responsible for the delays in the third time period. *Id.* ("Similarly, the result of DOL's critical path schedule analysis for the third performance period . . . is that Trafalgar is responsible for the remaining 55 days of critical delays[.]").

---

8. The CO denied the claims from the two other subcontractors, Wayne Crouse, Inc. and Roth Brothers, Inc. *See* PX 70 at 25–26. The CO

Next, the CO found that THC's decision, during the first time period, to resequence the order of building construction and compress the planned schedule resulting from the earthwork problems encountered by Kimberly, only had an adverse impact on the construction of Building I. *Id.* The inefficiencies that resulted from this adverse impact totaled $6,461. *Id.* ("The DOL's calculation of the net inefficiencies incurred at Building I as a result of the resequencing and schedule compression is $6,461."). Since the DOL was responsible for 76% of this cost, the CO determined that THC should recover $4,910 of direct costs from the delays in this time period. *Id.* Accordingly, the total compensation due THC was calculated as follows:

| | |
|---|---|
| Impact Costs (Including 5/H): | $ 5,156 |
| Plus: Commission/Profit (10%) (on $5,156 + $405,910) | $ 41,107 |
| Bond/Taxes/Insurance/Permits (3.18%) | $ 14,379 |
| Subtotal | $ 60,642 |

*Id.* at 50.

The CO's Final Report found that the total compensation due to Kimberly and THC was $466,552. *Id.* at 6.[8] Since the Government advanced THC $1,000,000 in February 1997, the CO concluded "the actual total compensation due on this Claim is $466,552, Trafalgar must repay the Government $533,448." *Id.*

### H. The Civil Case In The Circuit Court Of Kanawha, West Virginia.

On July 1, 1998 THC, Kimberly, and Corotoman filed a Complaint in the Circuit Court of Kanawha County, West Virginia, Civil Action No. 98–C–1557, against ZMM, Chapman Technical Group, DMJM/HTB, Inc., and H.C. Nutting. *See Trafalgar House Constr., Inc. v. ZMM, Inc.*, 211 W.Va. 578, 567 S.E.2d 294, 298 (2002). In that case, Plaintiffs alleged that the defendants "fraudulently and/or negligently misrepresented the [Job Corps] site's adverse subsurface conditions in the bid documents." *Id.* Prior to trial, Chapman Technical Group and H.C. Nutting settled for $1,042,932. *See* PX 72, Rule 26(a)(2)(B) Report at 26; TR 492. The

explained that THC or Kimberly might be responsible for the subcontractors' damages, but the Government was not. *Id.*

claims against DMJM/HTB proceeded to trial in July 2003. *See* DX 5 at 1 (West Virginia trial transcript). At trial, the jury found that the statute of limitations precluded any recovery for design fraud and rendered a verdict in favor of DMJM/HTB. *Id.* at 1970–71.

## II. PROCEDURAL HISTORY.

On June 7, 1999, THC filed a Complaint in the United States Court of Federal Claims that was assigned to the Honorable James T. Turner. THC's Complaint alleges four causes of action under the Contract Disputes Act and seeks monetary damages for: (1) Type I and Type II differing site conditions at the Project Site; (2) breach of contract, because DOL directed THC to perform work that "differed materially and substantially from the work described in and contemplated by the Contract;" (3) DOL's failure to issue an appropriate change order after it directed THC to "perform change, additional, and accelerated work[ ]"; and (4) DOL's failure to provide THC with "the knowledge and information in their possession, which directly affected cost and duration of the performance of the Project[.]" *See* Compl. ¶¶ 60–74. The Complaint seeks damages of $13,481,291. *Id.* ¶ 74.

On November 19, 1999, the Government filed an Answer and Counterclaim. On December 7, 1999, THC filed an Answer to the Government's Counterclaim. On July 23, 2002, this case was reassigned to the Honorable Emily C. Hewitt. On August 15, 2003, this case was re-assigned to the undersigned judge.

\* \* \*

On September 22, 2003 and December 17, 2003, the court convened status conferences. On January 26, 2004, the court issued a Scheduling Order that was modified, at the request of the parties, on April 21, 2004 and August 3, 2004. The August 3, 2004 Order set a trial date of September 19–30, 2005.

On August 11, 2005, THC filed a Memorandum of Contentions of Fact and Law, an exhibit list, and witness list. On August 19, 2005, the Government filed a Memorandum of Contentions of Fact and Law. On August 23, 2005, the Government filed an exhibit list. At the request of the parties, on August 26, 2005, the court entered on Order referring this case to the Honorable John P. Wiese, Senior Judge, for Alternative Dispute Resolution proceedings. On September 12, 2005, the court was informed that effort was unsuccessful, and so a trial was conducted from September 19–23, 2005.

On September 30, 2005, at the request of the Government, the court issued an order staying post-trial proceedings to allow the Government to consider whether to amend the November 19, 1999 Answer and Counterclaim to conform to evidence adduced at the trial. On January 3, 2006, the stay was lifted and a Post–Trial Scheduling Order was entered. On February 24, 2006, Plaintiff filed a Post–Trial Brief ("Pl. PT Brief").

On February 27, 2006, Defendant filed a Motion for Leave to File an Amended Answer to Incorporate an Additional Counterclaim. On March 13, 2006, Plaintiff filed a Response in Opposition to Defendant's Motion for Leave to File an Amended Answer to Incorporate an Additional Counterclaim. On April 4, 2006, Defendant filed a Post–Trial Memorandum ("Def. PT Mem."). On April 7, 2006, the court issued an order granting Defendant's Motion for Leave to File an Amended Answer to Incorporate an Additional Counterclaim, but stayed resolution of the Additional Counterclaim pending resolution of the parties' original claims and counterclaims. On April 7, 2006, Defendant filed an Amended Answer and Additional Counterclaim against THC under the False Claims Act, 31 U.S.C. §§ 3729 *et seq.*[9] On April 26, 2006, Plaintiff filed a Reply Brief ("Pl. PT Reply").

---

**9.** The False Claims Act provides that any person who "knowingly presents ... to an officer or employee of the United States Government ... a false or fraudulent claim for payment or approval ... is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages which the Government sustains because of the act of that person[.]" 31 U.S.C. § 3729(a).

## III. DISCUSSION.

### A. Jurisdiction.

#### 1. Requirements Of The Tucker Act.

The Tucker Act delineates the United States Court of Federal Claims' "jurisdiction to render judgment upon any claims against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1). The Tucker Act, however, is "only a jurisdictional statute; it does not create any substantive right enforceable against the United States for money damages." *United States v. Testan*, 424 U.S. 392, 398, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976). Therefore, in order to pursue a substantive right for money damages against the United States, a plaintiff must identify and plead a separate contractual relationship, constitutional provision, federal statute, and/or agency regulation that provides a substantive right to money damages. *See Todd v. United States*, 386 F.3d 1091, 1094 (Fed.Cir.2004) ("[J]urisdiction under the Tucker Act requires the litigant to identify a substantive right for money damages against the United States separate from the Tucker Act."); *see also Roth v. United States*, 378 F.3d 1371, 1384 (Fed.Cir.2004) ("Because the Tucker Act itself does not provide a substantive cause of action, however, a plaintiff must find elsewhere a money-mandating source upon which to base a suit.").

In this case, an express contract existed between THC and the Government. *See* PX 2 (Contract). The court has "jurisdiction to render judgment upon any claim by or against, or dispute with, a contractor arising under ... the Contract Disputes Act of 1978." 28 U.S.C. § 1491(a)(2).

#### 2. Requirements Of The Contract Disputes Act.

The Contract Disputes Act ("CDA"), 41 U.S.C. §§ 601, *et seq.*, governs the resolution of contract disputes arising between the government and contractors. *See Applied Companies v. United States*, 144 F.3d 1470, 1477 (Fed.Cir.1998) (citing *Cecile Indus. Inc. v. Cheney*, 995 F.2d.1052, 1055 (Fed.Cir.1993)). Under the CDA, a contractor may bring a breach of contract claim in the United States Court of Federal Claims. *See* 41 U.S.C. § 609(a)(1) ("[I]n lieu of appealing the decision of the contracting officer ... to an agency board, a contractor may bring an action directly on the claim in the United States Court of Federal Claims[.]").

##### a. Plaintiff's April 5, 1996 And Revised August 20, 1998 Request For Equitable Adjustment State A "Claim."

The CDA requires a plaintiff to exhaust available administrative remedies by submitting a "claim" to the responsible contracting officer and obtaining a "final decision" from that contracting officer, as a prerequisite to the United States Court of Federal Claims exercising jurisdiction over the dispute. *See* 41 U.S.C. § 605(a) ("All claims by a contractor against the government relating to a contract shall be in writing and shall be submitted to the contracting officer"). Only if the contracting officer denies the claim, may the aggrieved party file suit in the court. *Id.* § 609(a)(1). Although the CDA does not define "claim," that term has been defined in the Federal Acquisition Regulations as: "a written demand or written assertion by one of the contracting parties seeking, as a matter of right, the payment of money in a sum certain, the adjustment or interpretation of contract terms, or other relief arising under or relating to the contract." 48 C.F.R. § 2.101.

Early decisions of the United States Court of Appeals for the Federal Circuit held that no prescribed language is required to set forth a claim under the CDA:

We know of no requirement in the [Contract] Disputes Act that a "claim" must be submitted in any particular form or use any particular wording. *All that is required is that the contractor submit in writing to the contracting officer a clear and unequivocal statement that gives the contracting officer adequate notice of the basis and amount of the claim.*

*Contract Cleaning Maint. Inc. v. United States,* 811 F.2d 586, 592 (Fed.Cir.1987) (citations omitted; emphasis added); *see also Transamerica Ins. Corp. v. United States,* 973 F.2d 1572, 1578 (Fed.Cir.1992) (explaining that the United States Court of Appeals for the Federal Circuit "has definitively stated that certain 'magic words' need not be used and that the intent of the 'claim' governs") (citation omitted). Subsequently, in *James M. Ellett Constr. Co. v. United States,* 93 F.3d 1537 (Fed.Cir.1996), the United States Court of Appeals for the Federal Circuit clarified, at a minimum, that: "[T]here are three requirements a nonroutine submission must meet to be a 'claim.' It must be: (1) a written demand or assertion, (2) seeking as a matter of right, (3) the payment of money in a sum certain." *Id.* at 1542–43; *see also* 48 C.F.R. § 33.201.

In this case, the April 5, 1996 REA and its subsequent revision, filed on August 20, 1998, satisfy the requisite elements of a "claim." *See* DX 2, file 2 "REA_04–04–1996–Certified w KII and THC pages" (April 5, 1996 REA); PX 67a (Aug. 20, 1998 revised REA).

**b. Plaintiff's Certification Of The Request For Equitable Adjustment Was Technically Deficient.**

If a contractor asserts a claim under the CDA in excess of $100,000, the contractor must certify that: (1) the claim is made in good faith; (2) the supporting data is accurate and complete; (3) the amount requested accurately reflects the amount for which the contractor believes the Government is liable; and (4) the certifier is duly authorized to certify the claim on behalf of the contractor. *See* 41 U.S.C. § 605(c)(1). The primary purpose of this certification is to prevent the submission of fraudulent claims. *See Fischbach & Moore Int'l Corp. v. Christopher,* 987 F.2d 759, 763 (Fed.Cir.1993) (stating that the certification requirement is to "trigger[ ] a contractor's potential liability for a fraudulent claim under section 604 of the [CDA]. It is also designed to 'discourage the submission of unwarranted contractor claims and to encourage settlements.' ") (citations omitted).

■ In 1992, Congress amended the CDA to clarify that a technical "defect in the certification of a claim shall not deprive a court or an agency board of contract appeals of jurisdiction over that claim." 41 U.S.C. § 605(c)(6). FAR § 33.201 defines a defective certification as one that "alters or otherwise deviates from the language in 33.207(c) or which is not executed by a person duly authorized to bind the contractor with respect to the claim." 48 C.F.R. § 33.201. Although filing of a defective certification does not deprive the United States Court of Federal Claims of jurisdiction over the claim, *See* 41 U.S.C. § 605(c)(6), the failure to file an accurate certification prior to filing a claim cannot be cured, where the defect is substantive, *i.e.,* involving "bad faith, fraud, reckless and intentional disregard of the statutory certification requirements." H.R.Rep. No. 102–1006, *reprinted* in 1992 U.S.C.C.A.N., 3921, 3937; *see also City of Burbank v. United States,* 47 Fed.Cl. 261, 271 (2000) (citing *J & E Salvage Co. v. United States,* 37 Fed.Cl. 256, 261 n. 4 (1997)), *aff'd,* 152 F.3d 945 (Fed.Cir.1998), *cert. denied,* 525 U.S. 827, 119 S.Ct. 76, 142 L.Ed.2d 59 (1998).

■ In this case, THC's April 5, 1996 REA included a "Certificate of Current Cost or Pricing Data," signed by Larry J. McCandless, then THC's Senior Vice President of Operations. *See* DX 2, file 2 "REA _04–04–1996–Certified w KII and THC pages" at 33. A nearly identical certificate was submitted to DOL with the August 20, 1998 revised REA. *See* PX 67a at 2. Although this second certificate had a signature block for Mr. McCandless, it was left unsigned. *Id.* Moreover, both certificates failed to address all of the elements required by the CDA. They both failed to include the required representations that the claim was made in good faith and that the certifier was duly authorized to certify the claim. *See* DX 2, file 2 "REA_04–04–1996–Certified w KII and THC pages" at 33; PX 67a at 2; *see also* 41 U.S.C. § 605(c)(1) (listing the requirements for certified claim). Since these certifications failed to address two of the requirements set forth in 41 U.S.C. § 605(c)(1) and FAR § 33.207, they are technically deficient.

Under 41 U.S.C. § 605(c)(6), however, the court has jurisdiction only if the claim is

properly certified prior to the entry of final judgment. *See* 41 U.S.C. § 605(c)(6) ("A defect in the certification of a claim shall not deprive a court or an agency board of contract appeals of jurisdiction over that claim. Prior to the entry of a final judgment by a court ... the court ... shall require a defective certification to be corrected."). Accordingly, Plaintiff will be afforded 30 days from the issuance of this Memorandum Opinion and Order to file a non-defective certificate on behalf of THC.

### c. Plaintiff's Subcontractors Are Not Authorized To File A Certification.

■ The CDA requires that a subcontractor's claims against the government be brought by the prime contractor. *See United States v. Johnson Controls, Inc.* 713 F.2d 1541, 1550 (1983) (discussing "the well-entrenched rule that a subcontractor cannot bring a direct appeal against the government"). Moreover, when the claim requires certification, the prime contractor must certify that there is "good ground" for the subcontractor's portion of the claim. *See United States v. Turner Constr. Co.,* 827 F.2d 1554, 1561 (Fed.Cir.1987) ("[T]he certification requirement requires ... that the ... prime contractor believe[s] that there is good ground for the [subcontractor's portion of the] claim." (citations omitted)).

■ In addition to the technical deficiency in THC's April 5, 1996 and revised August 20, 1998 certificates, both certificates expressly state that they were valid only as to THC's portion of the claim. *See* DX 2, file 2 "REA_04–04–1996–Certified w KII and THC pages" at 33 ("This certification includes cost and pricing data *only for Trafalgar House Construction's portion* of this Request for Price Adjustment.") (emphasis added); PX 67a at 2 ("This certification includes cost and pricing data *only for Trafalgar House Construction's portion* of this Request for Price Adjustment.") (emphasis added). The record indicates that THC did not certify Kimberly's portion of the REA in disregard of the requirement that a prime contractor must certify the claim of a subcontractor, and was advised by an outside consultant that Kimberly's claim may have been fraudulent. *See* DX 2, file 11 "Correspondence between TAM and McManus" at 9–10/12. ("Under no circumstances should THC certify the REA with the Kimberly REA included in its present form."); DX 2, file 8 "TAM transmits Expert Opinion Report of 3–2–98 w exhibits" at 16/51 ("Kimberly's REA is at best circumstantial; and, given the number of insider transactions and lack of justification for its quantities, combined with Kimberly's failure to provide additional diligent support, may be irresponsible and is certainly not a proper REA."). Accordingly, THC's certificates are substantively defective as to the subcontractors' portions of the claim.

On August 25, 1998, the CO received a letter and attached documentation from "Kimberly Industries, Inc., *Trafalgar, Ltd.,* and Corotoman, Inc." *See* PX 67a, tab 2 (emphasis added). That letter referenced a "Joint Claim of Kimberly Industries, Inc., and Trafalgar House Construction, Inc. Job Corps Center, Charleston, West Virginia Job No. DOL # E–5019–5–00–82–20," and stated that the attached was a summary of the amount due on the "Joint Claim," as well as six other supporting documents. *Id.* at 1. The cover letter represented:

> Pursuant to **48 C.F.R. § 33.207,** Kimberly Industries, Inc., *Trafalgar, Ltd.,* and Corotoman, Inc., hereby certify that:
> 1. The claims contained *in the enclosed documents* are made in good faith;
> 2. The data contained *in the enclosed documents* is accurate and complete to the best of my knowledge and belief;
> 3. The amount requested *by the enclosed documents* accurately reflects the contract adjustment for which I believe the government is liable; and
> 4. I am duly authorized to certify the claim on behalf of Kimberly Industries, Inc., *Trafalgar,* Ltd., and Corotoman, Inc.

PX 67a, tab 2 at 1–2 (bold in original) (italicization added).

Neither Kimberly, "Trafalgar, Ltd.", nor Corotoman, however, were authorized, under the CDA to certify any claim in the contract at issue. *See Turner,* 827 F.2d at 1561. On

August 25, 1998, Mr. Wellford did not own any interest in THC; he did not acquire THC until April 2004. *See* TR 321–22. During the construction of the Job Corps Center, Mr. Wellford owned Trafalgor, Ltd. *See* TR 304–05, 313. Trafalgor, Ltd. operated a fleet of construction equipment and leased Kimberly the heavy equipment used for the earthwork at the Job Corps Center site. *Id.* Trafalgor, Ltd. had no corporate or other relationship with Plaintiff, THC. *Id.* Therefore, either the August 25, 1998 letter's reference to "Trafalgar, Ltd." is a misspelling of Trafalgor, Ltd., or an attempt to file a false certification.

The import of THC's April 5, 1996 and August 20, 1998 qualified certifications and the August 25, 1998 purported subcontractor certification did not arise until the Government cross examination at trial of Mr. Ross A. Dionne, Managing Partner of Economic Valuation Associates, PLLC, THC's financial and damage expert:

Q. GOVERNMENT COUNSEL: Okay. I also notice that this language is slightly different from what we just read in that it says ... "Submitted either actually or by specific identification in writing to the contracting officer or the contracting officer's representative in support of the request for price adjustment to contract number" and then there's the contract number, "are accurate, complete and current as of February 1996." Do you see that?

A. MR. DIONNE: I do.

Q. GOVERNMENT COUNSEL: Okay. Do you know why Trafalgar House put qualifications into its certificates?

A. MR. DIONNE: I don't.

Q. GOVERNMENT COUNSEL: That isn't a subject that came up when you were having your discussions with Mr. Bennett?

A. MR. DIONNE: No.

Q. GOVERNMENT COUNSEL: In any of your discussions did Mr. Bennett suggest that he didn't like, trust or wasn't willing to vouch for Kimberly's claim here?

A. MR. DIONNE: No.

Q. GOVERNMENT COUNSEL: All right. I'm going to go to Defendant's Exhibit 2, File 11, Correspondence Between TAM and McManus, TAM being T.A. McMullen whose name we've seen before. Do you see this document?

A. MR. DIONNE: I do.

Q. GOVERNMENT COUNSEL: All right. I'm at page 9 of 12 of it and I guess I'll ask you the same question, have you seen this document before?

A. MR. DIONNE: No.

Q. GOVERNMENT COUNSEL: You now know who T.A. McMullen is. Mr. McManus, does that name ring a bell?

A. MR. DIONNE: Yes.

Q. GOVERNMENT COUNSEL: We talked about him earlier. He was a member of the law firm of which you are familiar with Mr. Darden's name, right?

A. MR. DIONNE: Correct.

Q. GOVERNMENT COUNSEL: And they're lawyers for Trafalgar House?

A. MR. DIONNE: Yes.

Q. GOVERNMENT COUNSEL: I just want to focus on a couple of lines in this letter. The first sentence of the second paragraph says, "The audit shows that Kimberly's request for equitable adjustment is grossly inflated." Do you see that?

A. MR. DIONNE: Yes.

Q. GOVERNMENT COUNSEL: Did Mr. Bennett ever tell you that his claims consultant had advised his lawyers that Kimberly's REA was grossly inflated?

A. MR. DIONNE: No.

Q. GOVERNMENT COUNSEL: Okay. The fourth paragraph says, "It is my opinion that Trafalgar House should withdraw its request for equitable adjustment prepared by Kimberly and formally direct them to revise their proposal in accordance with the guidelines directed by the Department of Labor audit. Under no circumstances should Trafalgar House certify the REA with the Kimberly REA included in its present form." Do you see that?

A. MR. DIONNE: I do.

Q. GOVERNMENT COUNSEL: All right. That sounds like Trafalgar House's claims consultant is advising Trafalgar House's lawyers that they do not under

any circumstances want THF to certify Kimberly's REA. That's a fair summary of what I just read, isn't?

A. MR. DIONNE: Well, they want to withdraw Kimberly's portion of it, is the way I read that. Your characterization that they don't want anything to do with it, I mean, I don't know what their thinking was.

Q. GOVERNMENT COUNSEL: Well, I'm not asking what their thinking is. I'm asking if the claims consultant was advising the lawyer that under no circumstances should Trafalgar House certify the REA with the Kimberly REA included in its present form. Do you see that?

A. MR. DIONNE: Well, it says to withdraw it, which I guess by presumption is, yes, don't certify it.

Q. GOVERNMENT COUNSEL: This is news to you, right?

A. MR. DIONNE: Yes.

Q. GOVERNMENT COUNSEL: You didn't know that there was dialogue going on within the Trafalgar House organization that suggested that under no circumstances should Trafalgar House certify Kimberly's REA, right?

A. MR. DIONNE: I did not know that.

Q. GOVERNMENT COUNSEL: That would explain why that certification language we saw earlier indicates that it is certifying only Trafalgar House's portion of the REA, wouldn't it?

A. MR. DIONNE: I mean, I don't know the link between this letter and that certification.

Q. GOVERNMENT COUNSEL: Still not ringing any bells of any conversations that you had with Mr. Bennett?

A. MR. DIONNE: No. The discussion with Bennett was that they had a fight, at the end of the day, they paid Kimberly what they thought they needed to pay to get the project done.

Q. GOVERNMENT COUNSEL: Mr. Dionne, this isn't about having a fight with Kimberly. It's about submitting a claim to the government, right?

A. MR. DIONNE: I understand.

Q. GOVERNMENT COUNSEL: Okay. And Trafalgar House has to certify the claim to the government, right?

A. MR. DIONNE: Correct.

Q. GOVERNMENT COUNSEL: All right. And Trafalgar House is being advised under no circumstances to certify the Kimberly REA as it had already been submitted, right?

A. MR. DIONNE: Apparently so.

Q. GOVERNMENT COUNSEL: Okay. All right. Top of the next page, Mr. McMullen says, "I sincerely believe that if Trafalgar House Kvaerner advises Kimberly as requested by Norm Daniels on how to answer the audit, they could become part of assisting Kimberly in the preparation of a fraudulent claim." Do you see that?

A. MR. DIONNE: I do.

Q. GOVERNMENT COUNSEL: Again, that's a very serious matter, wouldn't you agree?

A. MR. DIONNE: Yes.

Q. GOVERNMENT COUNSEL: In doing any of your work, up to and including sitting here on the witness stand today, had no idea that anyone in the Trafalgar House organization suggested that Kimberly's claim might be fraudulent, right?

A. MR. DIONNE: That's correct.

Q. GOVERNMENT COUNSEL: Are you surprised?

A. MR. DIONNE: No.

Q. GOVERNMENT COUNSEL: Is that something you would have expected that you would have been told when you were doing your work?

A. MR. DIONNE: Well, parties that are in dispute with each other take their positions through counsel as advocate for their sides. Norm Daniels is an advocate for Kimberly and Mr. Darden and McManus were advocates for Trafalgar. To speak to their mindsets, you know, as lawyers in this process, I can't really say. I mean, the documents, the letters you're reading to me, speak for themselves. The allegations don't surprise me.

THE COURT: Counsel, when did you get this document?

GOVERNMENT COUNSEL: Where?

THE COURT: When. Do you know?

GOVERNMENT COUNSEL: When did I get it? From Mr. McTyre's workpapers. If you allow him to speak he could tell you to the best of his ability when he got it.

MR. MCTYRE: [These] are the documents that we received prior to the state court case.

THE COURT: In this case?

MR. MCTYRE: No, in the state court case.

THE COURT: I am totally confused now. How is it the government had discovery privileges in that case?

MR. MCTYRE: I testified as an expert in the state court case and these were some of the documents that were received in the discovery process for that case?

THE COURT: I see.

GOVERNMENT COUNSEL: Yes, Mr. McTyre was employed by the defendants in the state court case as well as then being employed by us, that is the U.S. Government in the federal case.... *The U.S. Government did not get it through the regular discovery in the Court of Federal Claims case.*

TR 990–96 (emphasis added).

\* \* \*

THE COURT: Counsel, before we leave this extraordinarily interesting document, could you tell me whether or not the government had a discovery request out in this litigation to which this document would have been responsive?

GOVERNMENT COUNSEL: I know discovery requests were sent out.

THE COURT: I know you came on the case midway.

GOVERNMENT COUNSEL: Exactly. I have the files and I can answer that question, but I can't tell you right now because I haven't reviewed our interrogatories or our document requests in the last 10 minutes to be able to—

THE COURT: No. Okay. It would seem typical, though, that the government would have a question that would be broad enough to include the document, I suspect.

GOVERNMENT COUNSEL: Especially with the newer rules of this Court, our document requests are extremely broad and usually anything that has anything to do with the project, which of course this would be responsive to—

TR 997–98.

\* \* \*

THE COURT: Counsel [for THC], you understand the significance of the certification issue?

PLAINTIFF'S COUNSEL: I do. My understanding, Your Honor, is at the time of the claim the REA and the claim was certified. I'll have to double check.

THE COURT: Because if it wasn't, I have no jurisdiction and this case will be dismissed.

PLAINTIFF'S COUNSEL: I understand.

THE COURT: And it will be dismissed with prejudice.

TR 1021.

THC's August 20, 1998 REA claimed entitlement to $14,481,291, of which $12,245,807 was for "Subcontractor Impacts." *See* PX 67a at I–10b; *see also* PX 70 at 4. The CO's May 14, 1999 Final Decision, however, found that THC's portion of the August 20, 1998 REA was $3,661,534. *Id.* at 27. Of that amount, however, $1,426,044 was derived from markups of subcontractor claims. *Id.* at 27 n. 14. Because the court does not have jurisdiction over any subcontractor claims that were not properly certified, the court's jurisdiction is limited to the claims that THC certified in the amount of $2,235,487. *Id.* at 27; *see also* PX 72 at Trafalgar House Construction, Inc., Summary of Economic Damages, Book 1, THC Schedules 1 & 2 (At trial, THC argued entitlement to $6,447,152, including $2,653,234 for payments made to Kimberly, Wayne Crouse, Inc. and Roth Brothers and an additional $2,208,748 for "subcontractor damages incurred by Kimberly, Wayne Crouse, Inc., and Roth Bros.").

## B. Standing.

THC was a corporation located in London, England, that was acquired by Norway-

based Kvaerner ASA ("Kvaerner") during the construction phase of the Contract. *See* TR 324. In April 2004, Kimberly acquired THC for $1, as well as the proceeds from the settlement of the Circuit Court of Kanawha County lawsuit. *See* TR 801, 321–22, 490–92. John Wellford, Kimberly's President, also became President of THC. *Id.* At the time of that acquisition, THC's assets consisted solely of the claim in this case. *Id.* Kimberly remains an active corporation, but THC no longer conducts business other than the pursuit of this claim. *See* TR 1189, 1194. Since THC signed the March 20, 1995 Contract, THC has standing to seek to enforce the terms of the Contract in the United States Court of Federal Claims. *See* PX 2.

### C. Standard For Decision Regarding A Differing Site Condition.

A differing site condition is a "latent physical condition[ ] at the site which differ[s] materially from those indicated in this contract." 48 C.F.R. § 52.236–2. This is known as a "Type I" condition. *See H.B. Mac, Inc. v. United States,* 153 F.3d 1338, 1343 (Fed. Cir.1998); *see also Stuyvesant Dredging Co. v. United States,* 834 F.2d 1576, 1581 (Fed. Cir.1987) (emphasizing that the bid documents or the contract must contain " 'reasonably plain or positive indications' that subsurface conditions were different from what was actually encountered.").

■ In *Comtrol, Inc. v. United States,* 294 F.3d 1357 (Fed.Cir.2002), the United States Court of Appeals for the Federal Circuit held that: "To establish entitlement to an equitable adjustment due to a Type I differing site condition, a contractor must prove, by preponderant evidence, that: the conditions indicated in the contract differ materially from those actually encountered during performance; the conditions actually encountered were reasonably unforeseeable based on all information available to the contractor at the time of the bidding; the contractor reasonably relied upon its interpretation of the contract and contract-related documents; and the contractor was damaged as a result of the material variation between expected and encountered conditions." *Id.* at 1362 (citing *H.B. Mac* 153 F.3d at 1345). On the

other hand, a contractor is not eligible for an equitable adjustment for a Type I differing site condition, "unless the contract indicated what that condition would be." *H.B. Mac,* 153 F.3d at 1345.

### D. The Court's Disposition Of The Government's Motion For Judgment On Partial Findings.

At the close of Plaintiff's case, the Government moved for judgment, pursuant to RCFC 52(c) because of:

GOVERNMENT COUNSEL: ... a failure of proof in Plaintiff's case .... the contract did not contain indications of the conditions that Trafalgar House complains of and that it believes were differing site conditions, therefore, the fundamental basis of a differing site condition claim doesn't exist.

TR 1018.

#### 1. On Plaintiff's Claim For Encountering Bedrock Lower Than Indicated.

##### a. Plaintiff's Argument.

■ Plaintiff argued that the CO's May 14, 1999 Final Decision that Kimberly encountered a differing site condition in Sections A–A, B–B, and F–F was sufficient proof of the Government's liability. *See* Pl. PT Brief at 10 (citing PX 70 at 7–8); *see also* DX 2; TR 1077, 1122, 23, 1170–71.

##### b. The Government's Response

The Government responded that a claim for encountering bedrock lower than indicated in the contract drawings may be compensable, but THC's claim cannot be paid, because "THC made no effort at all to separately identify the 'extra costs' at AA/BB FF ..., instead lumping all 'excavation' costs into a single claim element." Def. PT Mem. at 15–16.

##### c. The Court's Resolution.

As previously discussed, the court does not have jurisdiction over any claims asserted by THC on behalf of Kimberly, because a proper certification was not executed before this case was filed in the United States Court of

Federal Claims. Assuming *arguendo* that the court had such jurisdiction, THC still did not demonstrate entitlement to damages for encountering bedrock lower than indicated.

The CO's May 14, 1999 Final Decision admitted that a differing site condition was encountered at Section A–A/B–B. *See* PX 70 at 8 ("The DOL recognizes that Kimberly did encounter a differing site condition at Section A–A/B–B."); *see also* PX 124 at 11; TR 635–36. The CO, however, disputed Kimberly's claimed costs. *See* PX 70 at 8, 18–24.

The CO also did not dispute that a "differing site condition was encountered at Section F–F due to the lack of bedrock at the design elevation," however, the CO again disputed Kimberly's claimed costs. *See* PX 70 at 7,18–24. In fact, the CO expressed specific concerns over the increase in Kimberly's claimed costs for Section F–F, stating that

> On June 16, 1995 Trafalgar submitted a letter to the DOL stating that it had completed work on Section F–F at a cost of $32,736, consisting of $29,176.50 for Kimberly and Trafalgar's commission and tax. . . . [A claim for] Section F–F was included in the Original [April 5, 1996] REA in the amount of $162,993 for Kimberly, not including Trafalgar's mark-ups. (This is an increase of nearly 6 times the original costs claimed.)

PX 70 at 7.

The CO also observed that the cost analysis in the April 5, 1996 REA was based on a unit price methodology. *See* PX 70 at 3 ("Kimberly, in the Original [April 5, 1996] REA, used a unit price methodology, which identified quantities and unit prices for discrete activities."). The CO found this to be a reasonable means of calculating additional costs: "Kimberly, in the Original REA, used a reasonable approach to quantify the units of extra work (cy) and distribute the costs associated with the extra work." *Id.* at 20. In the revised August 20, 1998 REA, however, Kimberly changed its damage theory and calculations to a "Total Cost methodology." *Id.* ("Although Kimberly, in the Original REA, identified the discrete claim issues, the quantities of material associated with each, and the methodology for calculating unit prices, Kimberly subsequently changed its

methodology to a Total Cost methodology[.]"). In the May 14, 1999 Final Decision, the CO expressed considerable skepticism about this change. *See* PX 70 at 19 ("In the August 1998 Claim, Kimberly is requesting compensation in the amount of $10, 379,-441. . . . Kimberly does not . . . explain, document, support, or otherwise attempt to relate the $10 million amount to any claim theory, methodology, or supportable costs[.]"). Accordingly, the CO determined that the use of the total cost methodology was inappropriate in this case and proceeded to determine THC's and Kimberly's damages based on the initial Unit Price methodology. *Id.* at 2–6. Using this method, the CO awarded Kimberly $241,070 for encountering lower bedrock in Sections A–A/B–B and F–F. *See* PX 70 at 43.

At trial, THC's theory of damages and calculations was described as "a modified total cost methodology[.]" *See* PX 72 (Plaintiff's Expert Damages Report). After trial, THC attempted to justify this shift in position by arguing that "the impact of the differing site conditions on the earthwork portion of the project were so immediate, severe, and disrupting that to try to separate the impact out into discrete elements is practically impossible, and would only serve to understate the damages attributable to them." Pl. PT Reply at 19. THC's initial reliance on a unit price methodology in the April 5, 1996 REA belies this claim, because THC not only could, but did prove actual losses directly. Pursuant to an actual cost approach, the CO awarded Kimberly $241,070 for the encountering bedrock lower than indicated in the contract documents. *See* PX 70 at 43. This further undercuts Plaintiff's argument.

The United States Court of Appeals for the Federal Circuit has warned that "[a] trial court must use the total cost method with caution and as a last resort." *See Servidone Constr. Corp. v. United States,* 931 F.2d 860, 861 (Fed.Cir.1991). The reason for this concern is that "bidding inaccuracies" and "performance inefficiencies" on the part of the contractor can "skew accurate computation of damages." *Id.* at 861–62. As a result, the total cost method of computing damages should only be used when there are "extraordinary circumstances" and there is "no other

way to compute damages[.]" *Id.* at 862. To qualify to rely on the total cost methodology, the contractor must establish four elements: (1) the impracticality of proving actual losses directly, (2) the reasonableness of its bid, (3) the reasonableness of its actual costs, and (4) lack of responsibility for the added costs. *Id.* at 861. In this case, THC failed to demonstrate either "extraordinary circumstances" or that there was "no other way to compute damages." As a result, the use of a Total Cost methodology was not warranted. *Id.*

### 2. On Plaintiff's Claim For Removing Uncontrolled Fill.

#### a. Plaintiff's Argument.

■ Plaintiff also contested the project architect's requirement that THC remove uncontrolled fill in the A–A/B–B area, without additional compensation. *See* PX 33, 34. Plaintiff argued that the contract documents did not describe the "full extent or depth" of the uncontrolled fill. *See* PX 124 at 11; *see also* TR 635–36. Instead, THC argued that the Contract only required excavation to the subgrade of the buildings and that any uncontrolled fill below that depth was to remain undisturbed. *See* Pl. PT Brief at 4. As a result of being required to excavate all of the uncontrolled fill in Section A–A/B–B, THC claimed that it excavated "35 feet deeper than planned ... and dispose[d] of 88,000 cubic yards of unanticipated material located below the subgrade." *Id.* at 5.

#### b. The Government's Response.

The Government admitted that a differing condition existed regarding uncontrolled fill in Sections A–A/B–B, but argued that the claim fails, because, again, "THC made no effort at all to separately identify the 'extra costs' ... in the uncontrolled fill area." Def. PT Mem. at 15–16; *see also* PX 70 at 18–19 ("DOL finds that Kimberly is entitled to recover its actual cost for removing the Uncontrolled Fill[.] ... Kimberly's costs [for removing uncontrolled fill] appear to be based upon a Total Cost Methodology.... As indicated by the various REA/Claim documentation, as well as the audit results, sufficient records exist to show the specific cost impacts; Kimberly's bid is unrealistic as

shown by its own cost estimates since it misstated quantities and was unable to perform unaffected phases of the work for the amounts bid, and Kimberly completely ignores its own inefficiencies, as indicated in its as-bid and as-built charts and the Government's findings on entitlement. These facts preclude use of a Total Cost method of damage calculation.")

#### c. The Court's Resolution.

As previously discussed, the court does not have jurisdiction over any claims asserted by THC on behalf of Kimberly. Assuming *arguendo* that the court had such jurisdiction, THC did not demonstrate entitlement to damages regarding uncontrolled fill encountered in Sections A–A/B–B.

Instead, the CO found that Kimberly should be compensated for removing uncontrolled fill, but disputed Kimberly's cost calculations. *See* PX 70 at 18–24. The CO observed that, in the course of revising the REA for resubmission on August 20, 1998, Kimberly changed the cost assessment to a "Total Cost methodology." *Id.* The CO further determined that the use of the Total Cost methodology was not supported in this case and proceeded to determine that Kimberly was entitled to costs of $85,718, based on a Unit Price methodology, *i.e.* "its *actual cost* for removing the Uncontrolled Fill[.]" *Id.* at 2–6, 18–19.

At trial, THC's theory of damages and calculations regarding uncontrolled fill also was based on "a modified total cost methodology[.]" *See* Pl. PT Reply at 19 (citing PX 72 (Plaintiff's Expert Damages Report)). As previously discussed, however, the United States Court of Appeals for the Federal Circuit has held that "[a] trial court must use the total cost method with caution and as a last resort." *Servidone Constr.*, 931 F.2d at 861; *see also id.* at 862 (this method of computing damages should only be used when there are "extraordinary circumstances" and there is "no other way to compute damages[.]"). Again, THC failed to demonstrate either of these requirements. Accordingly, THC's use of a Total Cost

methodology for calculating damages has not been established in this case.

### 3. On Plaintiff's Claim For Providing Special Rock Fill.

#### a. Plaintiff's Argument.

██ THC also contested the CO's May 14, 1999 Final Decision to deny compensation for having to import approximately 36,000 cubic feet of special rock fill material to the site. *See* Pl. PT Brief at 13. On August 2, 2005, MM & A submitted another report after this lawsuit was filed entitled *"Changed Site Conditions, New Job Corps Center." See* PX 125. MM & A was hired by Kimberly "to prepare an opinion regarding the site conditions found by Kimberly . . . when it was contracted to excavate, backfill, and grade the proposed site for the New Job Corps Center in Charleston, West Virginia. MM & A was to determine if the conditions found by Kimberly at the proposed site were significantly different from the descriptions found in the bid documents, which included the geotechnical reports." *See* PX 125 at 1.

One of MM & A's reports stated that "conclusions within the Geotechnical Report of the original Contract Documents misleadingly indicate an ample supply of special rock existed on site[.]" PX 125 at 3. Therein, MM & A criticized H.C. Nutting's representation "that the competent sandstones and siltstones . . . are suitable for use as special rockfill with the proper site and fills." *See* TR 663. In addition, the cross sections noted in H.C. Nutting's June 21, 1994 Geotechnical Report averaged areas that should not have been averaged and, therefore, did not take into account changes in the character of the bedrock, overstating the amount suitable as Special Rock Fill. *See* Pl. PT Brief at 13–14 (citing TR 595–96, 652). Likewise, some of the bedrock identified in both the Initial and Supplemental Geotechnical Reports was located between layers of other unsuitable rock or did not meet the size gradient or otherwise was not sufficiently strong. *Id.* at 14 (citing TR 596, 652, 662–63, 716). In addition, MM & A also discovered a survey error that resulted in the use of inaccurate elevations in the geotechnical reports. MM & A concluded that this error was responsi-

ble for "a significant portion" of the contractor's "overall 60,000 cubic yard" underbid of the total project excavation. *Id.* at 15–16 (citing TR 688, 692–93).

Accordingly, Plaintiff argued that since the representations made in both the Initial and Supplemental Geotechnical Reports expressly were incorporated into the Contract between THC and DOL, THC reasonably expected to encounter "subsurface conditions [that were] materially different than those THC and Kimberley actually encountered." *Id.* at 17–18.

#### b. The Government's Response.

First, the Government responded that the contract documents did not provide any "guarantee, representation, estimate, or any other information that can be construed as a specific indication of the quantity of rock on site that was usable for SRF[.]" Gov't PT Brief at 5. What was provided was boring information that THC did not challenge. *Id.* (citing TR 250–57). The Government relies on the fact that neither the Initial Geotechnical Report nor Supplemental Geotechnical Report represented that 76% of the bedrock could be used as special rock fill, but only reported the composition of bedrock at certain locations. *See* Gov't PT Brief at 6 (citing PX 1, part 6 at 109–121/121); *see also Weeks Dredging & Contracting, Inc. v. United States,* 13 Cl.Ct. 193, 221–22 (1987) (holding that "various material descriptions contained in . . . 156 boring logs were intended to depict for the prospective bidders the general character and nature of the materials expected to be found in the subsurface project area reasonably contiguous to where the borings were taken" and not that "the boring logs . . . were *ipso facto* a reliable, intended, and definitive indication of the reasonably approximate . . . quantity of each of the subsurface materials across the entire contract site."), *aff'd* 861 F.2d 728 (Fed.Cir.1988). In addition, both geotechnical reports contained a specific disclaimer that the information contained therein could not be relied on "to determine the cost of construction." *See* PX 1, part 5 at 275/359; *id.,* part 6 at 25/121.

Second, the Government contended that the shortage of rock fill was foreseeable, because THC's pre-bid documents evidence that THC was aware that at least 45,000 cubic yards of rock on the site was unusable as special rock fill. *See* Def. PT Mem. at 9–12 (citing PX 1, 5, 76). Moreover, THC had ample opportunity to conduct independent tests prior to submitting a bid. *Id.* (citing TR 382–87).

Third, the Government asserted that an essential element of a Type I differing site condition claim is that the contractor reasonably relied on the contract in formulating the bid. *See* Def. PT Mem. at 12 (citing *Stuyvesant Dredging Co. v. United States*, 834 F.2d 1576, 1581 (Fed.Cir.1987)) ("To prevail on a claim for differing site conditions ... The contractor also must show that it reasonably relied upon its interpretation of the contract and contract-related documents and that it was damaged as a result of the material variation between the expected and the encountered conditions." (citations omitted)). The Government avers that THC failed to introduce any evidence at trial as to what the relevant THC employees relied on in preparing THC's bid. *Id.* ("The actual bid estimators were Mr. Aliff and Mr. Hanna—two individuals whom THC consciously elected *not* to call to testify[.]") Instead, only Mr. Wellford and Mr. Feddock, MM & A's Senior Vice President testified, neither of whom were involved in preparing THC's bid. *Id.* (citing PX 125); *see also* TR 331, 340–42, 479, 589–693.

Finally, the Government pointed out that the difference between the best case scenario and the worst case scenario was 45,000 cubic yards of special rock fill, establishing "that whatever contract 'indications' existed, in whatever form (text of geotechnical report, lines and grades on drawings, etc.), they were so undefined that THC did not even guess at the amount of SRF within almost 45,000 cubic yards. This is hardly the type of 'specific indications' required for a Type I differing site condition claim." Def. Post-Trial Memo at 8–9 (citing *Dawco Constr. Inc. v. United States*, 18 Cl.Ct. 682, 688 (1989)), *aff'd in part and rev'd in part on other grounds*, 930 F.2d 872 (Fed.Cir.1991) ("A

contractor will not be awarded an equitable adjustment for a differing site conditions claim unless the contract indicated specifically what the conditions were that one might expect."(citations omitted)).

### c. The Court's Resolution.

Once again, the court does not have jurisdiction over any of the claims asserted by THC on behalf of Kimberly. Assuming *arguendo*, that the court had such jurisdiction regarding the Special Rock Fill claims, nevertheless, THC has failed to establish the requisite elements for a Type I differing site condition claim. The Contract incorporated FAR 52.252–2(a), requiring the contractor to establish all four required elements to prevail on a Type I differing site claim:

(1) the conditions indicated in the contract differ *materially* from those actually encountered during performance;

(2) the conditions actually encountered were *reasonably unforeseeable* based on *all information available* to the contractor at the time of bidding;

(3) the contractor *reasonably relied* upon its interpretation of the contract and contract-related documents; *and*

(4) the contractor was damaged as a result of the material variation between expected and encountered conditions.

*Weeks Dredging & Contracting*, 13 Cl.Ct. at 218–19 (emphasis added); *see also Stuyvesant Dredging*, 834 F.2d at 1581 (stating the criteria for a differing site conditions claim).

The conditions "indicated in the contract" regarding special rock fill were found in the Supplemental Geotechnical Investigation that advised:

We *anticipate* that rock removed from the deeper excavations within the upper portions of the site will be used as special rock fill to construct the sidehill fills.... Twenty test pits were performed within the proposed building areas to evaluate rock excavatability and the depth to bedrock.... As discussed in our October [26] 1993 geotechnical report, the site is characterized by generally firm natural overburden soils and shallow depth to bedrock.... The sandstone and siltstone are generally

well cemented and medium hard to hard. Coring is generally required to penetrate the competent siltstone and sandstone.

PX 1, part 6 at 8–12/121 (emphasis added); *see also* TR 181–83 (Kimberly President, Mr. Wellford, testifying as to his understanding of the findings of the bore holes).

\* \* \*

The combined results of our supplemental and original rock core programs *indicate* that the competent bedrock at cored locations consist of *approximately* 75% sandstone, 1% siltstone, and 24% claystone and shale. The competent sandstone and siltstone have unconfined strengths ranging from 203 to 487 [tons per square foot] and are suitable for use as special rock fill within proposed sidehill fills.

*Id.*, part 6 at 24 (emphasis added).[10]

The court construes the words "anticipate," "indicate," and "approximately" as describing the Government's best belief as to the type and amount of bedrock that might be used as special rock fill, but not a guarantee, particularly since the rock cores only indicated the nature of the conditions reasonably proximate to where the borings were taken. Therefore, it was unreasonable for THC to extrapolate from H.C. Nutting's analysis of the rock core samples, *i.e.*, because 76% of the bedrock in the core locations may have been suitable for use as special rock fill, 76% of the bedrock over the entire site also was usable as special rock fill. *See Weeks Dredging*, 13 Cl.Ct. at 221 ("It is not at all clear from the contract documents how the plaintiff vaults from the clear and unambiguous language depicting *only* the character descriptions of each material in the several boring logs, to a claim that the government was simultaneously warranting the approximate, if not the precise, quantum of each category of subsurface materials by those same character descriptions.")

Accordingly, the court has determined that the information describing the type and amount of special rock fill in the Contract, incorporating the geotechnical reports by ref-

erence, did not differ materially from those encountered during performance. The court further has determined that this information was not disclosed to induce a proposed bidder to rely on it in preparing the cost elements of a bid. Therefore, the fact that the actual amount of special rock fill required was different is not relevant to whether that difference was material. *See* PX 124 at 11–12; *see also* TR 27–37.

Assuming *arguendo* that the conditions concerning special rock fill were materially different, the conditions were reasonably foreseeable by the contractor, because the Initial Geotechnical Report and Supplemental Geotechnical Report both contained the following disclaimer and warning:

*The geotechnical report is prepared primarily to aid in the design of site work and structural foundations.* Although the information in the report is expected to be sufficient for these purposes, *it is not intended to determine the cost of construction or to stand alone as a construction specification.* Report recommendations are based primarily on data from test borings made at the locations shown on a boring location drawing included. *Soil variations may exist between borings* and these variations may not become evident until construction. If significant variations are then noted, the geotechnical engineer should be contacted so that field conditions can be examined and recommendations revised if necessary. The geotechnical report states our understanding as to the location, dimensions and structural features proposed for the site. Any significant changes in the nature, design or location of the site improvements MUST be communicated to the geotechnical engineer so that the geotechnical analysis, conclusions, and recommendations can be appropriately adjusted.

PX 1, part 5, at 276/359; *see also id.*, part 6 at 25/121 (emphasis added).

Finally, the Government neither prohibited nor took any steps to impede THC's retaining an independent expert to conduct further tests about the site prior to bidding. *See* TR

---

**10.** "[T]he seismic report contained in the ... geotechnical report ... predicted that virtually all of the rock on the project was 'rippable,' which makes it of questionable quality for [special rock fill]." *See* PX 1, part 6, at 115–116/121; *see also* TR 457–464.

386–87, 396.[11] Therefore, the conditions encountered were reasonably foreseeable, based on *all* information *available* to THC at the time of bidding. Since the first two required elements of a Type I differing site claim were not met by a preponderance of the evidence, as a matter of law, THC did not meet its burden of proof at trial. *See Weeks Dredging,* 13 Cl.Ct. at 218–19.

For these reasons, the court has determined that THC failed to establish a Type I differing site condition regarding special rock fill. Moreover, for the reasons previously discussed, THC also failed to demonstrate entitlement to utilize a total cost methodology for determining damages.

### 4. On Plaintiff's Claim For Project Delays On Account Of Site Conditions.

#### a. Plaintiff's Argument.

█ Finally, Plaintiff argued that the problems encountered by Kimberly during the earthwork phase of construction required THC to resequence the construction order of the buildings and incur costs. *See* Pl. PT Brief at 18–19. Since the Government conceded that differing site conditions existed as to the lower bedrock encountered at Sections A–A, B–B, and F–F, as well as the existence of uncontrolled fill on the site, THC concluded that this was sufficient evidence to establish a damage entitlement. *Id.* at 19.

#### b. The Government's Response.

The Government responded that the earthwork claims are not compensable, either directly to Kimberly, or indirectly to THC, based on THC's building construction delays stemming from Kimberly's delayed earthwork. *See* Def. PT Mem. at 16 ("THC's claim is a total delay, total cost claim that was not broken down with sufficient clarity so that THC's ... costs can be separately ascertained with the requisite certainty." (citations omitted)).

#### c. The Court's Resolution.

The record shows that construction delays were encountered by Kimberly at the Job Corps site. *See* PX 70 at 38–40. As previously discussed, however, the court does not have jurisdiction over any delay claims that THC has asserted on Kimberly's behalf. Assuming *arguendo* that the court had such jurisdiction, THC, nevertheless, failed to establish any separate injury for the delay that differed from that determined by the CO's Final Decision. *Id.* at 40 ("Trafalgar is entitled to $4,910 of direct costs as a result of the change in resequencing and schedule compensation."). Accordingly, THC's additional claim regarding project delays on account of site conditions failed for lack of proof.

## IV. CONCLUSION.

For the above stated reasons, upon Plaintiff's re-filing a non-defective certification within 30 days, the court will enter a final partial judgment, pursuant to RCFC 54(b) in favor of the Government. If Plaintiff declines to submit the requisite certification, the court will dismiss the Complaint, pursuant to RCFC 12(b)(1). Thereafter, the court will issue a separate Memorandum Opinion and Final Order regarding the Government's Counterclaims. *See* Def. PT Mem. at 23–24.

**IT IS SO ORDERED.**

---

11. At trial, MM & A's Senior Vice President advised the court that contractors of Kimberly's size do not have a geotechnical engineer on staff to evaluate an existing geotechnical data. *See* TR 683; *see also* TR 685–86. Nor would one be retained for a job in the $1.2–$2.5 million range. *See* TR 694 (If MM & A had been retained by Kimberly to do that work, it would have taken approximately two months.) Although that may be so, THC assumed the risk of not properly ascertaining this information. *See* 48 C.F.R. § 52.236–3 ("The Contractor also acknowledges that it has satisfied itself as to the character, quality, and quantity of surface and subsurface materials or obstacles to be encountered insofar as this information is reasonably ascertainable from an inspection of the site, including all exploratory work done by the Government, as well as from the drawings and specifications made a part of this contract.... The Government assumes no liability for any conclusions or interpretations made by the Contractor based on the information made available by the Government."). Moreover, to the extent that THC's claims relied on the qualified language of the Supplemental Geotechnical Report, such reliance was unreasonable, based on the specific disclaimer and warning contained therein.