**TRAFALGAR HOUSE CONSTRUCTION, INC., Plaintiff,**

v.

**The UNITED STATES, Interest; Defendant.**

**No. 99–363C.**

United States Court of Federal Claims.

April 30, 2007.

Norman T. Daniels, Jr. and Carl L. Fletcher, Jr., Daniels Law Firm, P.L.L.C., Charleston, West Virginia, Counsel for Plaintiff.

Brian S. Smith, United States Department of Justice, Civil Division, Washington, D.C., Counsel for Defendant.

## MEMORANDUM OPINION AND FINAL ORDER

BRADEN, Judge.

This case involves construction of a new Job Corps Center on a mountain located on the outskirts of Charleston, West Virginia by the Department of Labor ("Government" or "DOL"). *See Trafalgar House Constr., Inc. v. United States,* 73 Fed.Cl. 675, 677 (2006) (*"Trafalgar House I "*). On March 20, 1995, DOL awarded a fixed price contract in the amount of $17,270,000 to Trafalgar House Construction, Inc. ("THC" or "Plaintiff") for the construction of the new Job Corps Center. *Id.* at 678. On April 10, 1995, THC selected Kimberly Industries, Inc. ("Kimberly") as the earthwork subcontractor. *Id.* at 682. Almost immediately thereafter, Plaintiff and Kimberly experienced construction problems at the job site. *Id.* at 682–85. Litigation ensued in the United States Dis-

trict Court for the Southern District of West Virginia and the United States Court of Federal Claims.

On October 31, 2006, the court issued a Memorandum Opinion and Order resolving the breach of contract claims asserted in Plaintiff's June 7, 1999 Complaint in favor of the Government. *See Trafalgar House I*, 73 Fed.Cl. at 704. Remaining before the court are entry of a final judgment regarding Plaintiff's breach of contract claims and two pending counterclaims asserted by the Government.

## I. JUDGMENT IS ENTERED IN FAVOR OF THE GOVERNMENT ON PLAINTIFF'S BREACH OF CONTRACT CLAIMS.

On October 31, 2006, the court issued a Memorandum Opinion and Order determining that the certifications submitted with Plaintiff's April 5, 1996 Request for Equitable Adjustment ("REA") and Plaintiff's August 20, 1998 REA were deficient, because they did not comply with the requirements set forth in 41 U.S.C. § 605(c)(1) and 48 C.F.R. § 33.207(c). *See Trafalgar House I*, 73 Fed.Cl. at 693–94. In addition, the certification submitted with the August 20, 1998 REA was unsigned. *Id.* To enable the court to enter a final judgment, Plaintiff was afforded the opportunity, if possible, to file a non-defective certification. *Id.* at 694; *see also* 41 U.S.C. § 605(c)(6) ("Prior to the entry of a final judgment by a court ... the court ... shall require a defective certification to be corrected."). On November 22, 2006, Plaintiff filed a corrected certification, *i.e.*, the certificate was signed and included the required representations that the claim was made in good faith and the certifier was

duly authorized to certify the claim. *See* Certification of Claim at 1, *Trafalgar House Constr. v. United States*, No. 99–363 (Fed.Cl. Nov. 22, 2006). Accordingly, the court is now authorized to enter a judgment in favor of the Government with respect to the breach of contract claims asserted in the June 7, 1999 Complaint. *See Trafalgar House I*, 73 Fed.Cl. at 698–704 (finding in favor of the Government on each of Plaintiff's four claims).

## II. RESOLUTION OF THE GOVERNMENT'S COUNTERCLAIMS.

### A. Relevant Procedural Background.[1]

The Government's November 19, 1999 Answer and Counterclaim asserted a counterclaim seeking damages of $533,448, plus interest. *See* First Counterclaim ¶¶ 77–84. The $533,488 amount claimed is the difference between the $1 million interim payment advanced by the CO to THC on February 20, 1997 and the CO's May 14, 1999 Final Decision that THC should be awarded $466,552. *Id.* ¶ 83; *see also* PX 70 at 6, 43.

From September 19–23, 2005, a trial was conducted by the United States Court of Federal Claims. The court subsequently determined that Plaintiff's breach of contract claims were without merit. *See Trafalgar House I*, 73 Fed.Cl. at 698–704. In response to the evidence adduced at trial, the Government revised its damages request to recoup the entire $1 million interim payment. *See* Am. Answer ¶ at 1; *see also* Gov't PT Brief at 17. In addition, on April 7, 2006, the court entered an Order granting the Government's Motion to Amend the Answer to include an additional Counterclaim.[2] On April 7, 2006,

---

1. The facts and procedural history of this case were discussed extensively in *Trafalgar House I*, 73 Fed.Cl. at 677–92. Additional facts cited in this Memorandum Opinion and Final Order are derived from: Plaintiff's Exhibits ("PX 1–126"); Defendant's Exhibits ("DX 1–5"); the transcript of the September 19–23, 2005 trial ("TR 1–1207"); the Government's November 19, 1999 Answer ("Answer") and Counterclaim ("First Counterclaim"); the Government's April 4, 2006 Post–Trial Memorandum ("Gov't PT Memo."); the Government's April 7, 2006 Amended Answer ("Am.Answer") and Additional Counterclaim ("Second Counterclaim"); and Plaintiff's Janu-

ary 23, 2007 Brief in Opposition to Counterclaims ("Pl.Opp.").

2. During trial, Kimberly's owner testified that Kimberly's bid for the earthwork subcontract was "about a $1 million" less than the bids submitted by competitors, which were approximately $2.5 million. *See* TR 318–19; 328–29. Based on this and other testimony adduced at trial, the court expressed concern that the subcontractors' bidding practices may conflict with federal antitrust laws. *See* TR 438–43; *see also* TR 1202–06 (sealed). Accordingly, the court suggested that the Government's counsel "re-

the Government filed an Amended Answer and also filed an Additional Counterclaim under the False Claims Act, 31 U.S.C. § 3729. *See* Second Counterclaim ¶¶ 102–04.

### B. Jurisdiction.

The United States Court of Federal Claims has "jurisdiction to render judgment upon any setoff or demand by the United States against any plaintiff[.]" *See* 28 U.S.C. § 1503; *see also* 28 U.S.C. § 2508 ("Upon the trial of any suit in the United States Court of Federal Claims in which any setoff, counterclaim, claim for damages, or other demand is set up on the part of the United States against any plaintiff making claim against the United States in said court, the court shall hear and determine such claim or demand both for and against the United States and plaintiff. If upon the whole case it finds that the plaintiff is indebted to the United States it shall render judgment to that effect, and such judgment shall be final and reviewable.").

### C. The Government's Counterclaim To Recoup The February 20, 1997 Interim Payment Is Granted.

■ The Government's First Counterclaim alleges that:

On February 20, 1997, [DOL] issued a modification to the contract that increased the value of the contract by $1,000,000. This modification did not represent a determination by [DOL] that [Plaintiff] was entitled to an additional $1,000,000, but rather was an advance interim payment

upon [Plaintiff]'s REA and was contingent upon the contracting officer determining that [Plaintiff] was actually entitled to an upward adjustment in contract price.

\* \* \*

On May 14, 1999, [DOL] issued a contracting officer's final decision on [Plaintiff]'s claim. The contracting officer's final decision determined that [Plaintiff] was entitled to an upward contract adjustment of $466,552. The contracting officer also determined that, because [DOL] had made an advance payment of $1,000,000, [Plaintiff] was required to repay the sum of $533,448 to the United States.

First Counterclaim ¶¶ 81, 83.

At trial, the Government requested that the court award the Government $533,448, plus interest. *Id.* ¶ 84. Based on this and other evidence adduced at trial, the Government now asserts that "[b]ecause [Plaintiff]'s claims are without merit, ... the Government is entitled to return of the [entire] provisional payment of $1 million." Gov't PT Brief at 17.

In response, Plaintiff asserts that the CO testified at trial that Plaintiff was entitled to recover $466,552, for the reasons set forth in the May 14, 1999 Final Decision. *See* Pl. Opp. at 2–3. This testimony was corroborated by Mr. John McTyre's testimony [3] that Plaintiff is entitled to recover $543,514 for scheduling and construction costs, for essentially the same reasons.[4] *Id.; see also* TR 1041–42, 1129; DX 1, file "Background-summary of Opinions" (Summary of McTyre

---

consider its counterclaims." TR 1019. The court assumes the Government did not pursue an antitrust counterclaim because the specific incident may be subject to statute of limitations considerations.

[3] Mr. McTyre is a Vice–President at Warner Construction Consultants, Inc. and was hired by the Government to assist in evaluating Plaintiff's April 5, 1996 REA. *See Trafalgar House I*, 73 Fed.Cl. at 687–88.

[4] Mr. McTyre testified that despite the $76,962 difference in entitlement calculations, his Damages Report was "very similar" to the CO's May 14, 1999 Final Decision. *See* TR 1129; *compare* DX 1, file "Background–Summary of opinions" at 3, *with* PX 70 at 5–6. For example, both the CO and Mr. McTyre determined that Plaintiff

was entitled to compensation for three of the four differing site condition claims asserted, *i.e.* the Section F–F Claim, the Section A–A/B–B Claim, and the Uncontrolled Fill Claim. *See* DX 1, file "costevaluation" at 11; PX 70 at 5–6. In addition, neither Mr. McTyre, nor the CO found entitlement for the SRF claim. *Id.* Mr. McTyre testified that the $76,962 difference is explained by the CO's decision to determine the amount due Plaintiff by starting with the amounts proposed in Mr. McTyre's Report and then engaging in a collaborative decision-making process with the other individuals reviewing Plaintiff's claims in order to arrive at the final determinations included in the CO's May 14, 1999 Final Decision. *See* TR 1173.

Damages Report). Therefore, Plaintiff contends that the Government is only "entitled to reimbursement of at most $457,000.00 of the $1 million advance payment previously made to THC, and not the entirety of it." Pl. Opp. at 3.

The court's October 31, 2006 Memorandum Opinion and Order held that Plaintiff was not entitled to recover on any of Plaintiff's four breach of contract claims. *See Trafalgar House I*, 73 Fed.Cl. at 698–704. It is clear from the record that Plaintiff understood that the February 20, 1997 interim payment was an advance. *See* PX 67a at I10b (financial summary of Plaintiff's August 20, 1998 REA including a line item of $1,000,000 for "DOL Advance"); PX 70 at 4, 6, 43; TR 257–58 (Plaintiff's President testifying that "the $1 million was effectively *a down payment* on what was due") (emphasis added); TR 845 (Mr. Ross Dionne, Plaintiff's damages expert testifying that "I have also isolated the offsets that are in this case, including *the million dollar payment advanced by the Department of Labor* [.]") (emphasis added); TR 1053 (CO testifying about the $1 million advance to Plaintiff). It is also true that both the CO and Mr. McTyre testified that Plaintiff was entitled to recover on a portion of its claims. *See* TR 1070–71 (CO testifying that Plaintiff was due $466,552); DX 1, file "Summary of Opinions" at 3 (Mr. McTyre's Report concluding that Plaintiff was due $543,514 on its claims). After assessing *all* of the evidence presented at trial, however, the court determined that Plaintiff was not entitled to recover on any of its breach of contract claims. *See Trafalgar House I*, 73 Fed.Cl. at 698–704. Accordingly, the court has determined that the Government established, by a preponderance of the evidence, that Plaintiff is not entitled to retain any portion of the February 20, 1997 interim payment of $1 million and the Government is entitled to a judgment to recoup that amount from Plaintiff.

The Government also seeks prejudgment interest on this award. The Government, however, cites no statutory or contractual provision mandating recovery of interest. The United States Supreme Court, however, has authorized an award of interest on a

claim for recoupment. *See Royal Indemnity Co. v. United States*, 313 U.S. 289, 296, 61 S.Ct. 995, 85 L.Ed. 1361 (1941) ("In the absence of an applicable federal statute it is for the federal courts to determine, according to their own criteria, the appropriate measure of damage, expressed in terms of interest, for non-payment of an amount found to be due."); *see also United States v. Texas*, 507 U.S. 529, 533, 113 S.Ct. 1631, 123 L.Ed.2d 245 (1993) (reaffirming the authority of federal courts to award pre-judgment interest as compensatory damages for breach of contract). In this case, the court has decided that an award of interest is appropriate. Accordingly, the court has determined that the Government is entitled to a judgment of $1 million, plus interest.

### D. The Government's False Claims Act Counterclaim Is Denied.

#### 1. Elements Of The False Claims Act.

█ The False Claims Act provides that any person who "knowingly presents, or causes to be presented, . . . a false or fraudulent claim for payment or approval" shall be liable "for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages which the Government sustains because of the act of that person[.]" 31 U.S.C. § 3729(a). In order to recover damages for a violation of the False Claims Act, the Government must establish that:

(1) the contractor presented or caused to be presented to an agent of the United States a claim for payment;

(2) the claim was false or fraudulent;

(3) the contractor knew the claim was false or fraudulent; and

(4) the United States suffered damages as a result of the false or fraudulent claim.

*Young–Montenay, Inc. v. United States*, 15 F.3d 1040, 1043 (Fed.Cir.1994) (quoting *Miller v. United States*, 213 Ct.Cl. 59, 550 F.2d 17, 23 (1977)).

█ A contractor will be deemed to have "knowingly" presented a false claim when that individual either has actual knowledge that the claim is false, or acts in "deliberate ignorance" or "reckless disregard" of

the truth or falsity of the claim. *See* 31 U.S.C. § 3729(b); *see also Commercial Contractors, Inc. v. United States,* 154 F.3d 1357, 1362 (Fed.Cir.1998). The Government does not have to prove specific intent to defraud. *Id.* "Reckless disregard" has been defined as an " 'aggravated form of gross negligence.' " *UMC Elec. Co. v. United States,* 43 Fed.Cl. 776, 792 n. 15 (1999) (quoting *United States ex rel. Aakhus v. Dyncorp, Inc.,* 136 F.3d 676, 682 (10th Cir.1998)). At a minimum, a contractor is required to examine records to ensure they are consistent with the submitted claim. *Id.* at 794 ("The case law stands for the proposition that a failure to make a minimal examination of records constitutes deliberate ignorance or reckless disregard[.]" (citing *United States v. TDC Mgmt. Corp.,* 24 F.3d 292, 298 (D.C.Cir.1994))).

The Government, however, must establish each element of the cause of action by a preponderance of the evidence. 31 U.S.C. § 3731(c); *see also Commercial Contractors, Inc.,* 154 F.3d at 1362 ("The government must prove the elements of the cause of action by a preponderance of the evidence.").

### 2. The Parties' Arguments.

#### a. The Government's Argument.

█ The Government asserts that Plaintiff's differing site condition claim concerning special rock fill ("SRF") violates the False Claims Act, because the claim is "without merit, yet it was pursued by [Plaintiff] with reckless disregard[.]" Gov't PT Memo. at 18; *see also id.* at 4–15 (summary of the evidence against Plaintiff's SRF claim). First, the Government argues that there was no material difference between the conditions encountered on site and the information provided in the bidding process. *Id.* at 4–8. Second, the contract did not include any guarantee about the amount of SRF that would be available on site. *Id.* This is best evidenced by the difference between Plaintiff's "best case" and "worst case" estimates of the amount of SRF that would be available on site. *Id.* at 8–9 ("[T]here was a massive

difference between [Plaintiff]'s 'best case scenario' of 79,000 cubic yards of SRF on site versus a 'worst case scenario' of 34,000 cubic yards.").

Second, the Government asserts that Plaintiff should have foreseen the lack of SRF, based on the work site information contained in the contract documents. In addition, Plaintiff failed to verify its interpretation of the contract documents. *Id.* at 11 ("[Plaintiff] had the opportunity to obtain detailed information about the quality of the rock [on site], for example, by conducting sample tests, evaluating the work previously done on site by Kimberly, or obtaining its own geotechnical engineer. [Plaintiff] did none of this.").

In addition, the Government contends that Plaintiff did not present competent evidence at trial to demonstrate that it relied on any specific contract provision regarding the amount of SRF available on site when Kimberly prepared the earthwork subcontract bid. *Id.* at 12–13. The negotiations and revisions to the proposed earthwork subcontract that occurred between April 10, 1995, when Kimberly started work, and June 9, 1995, when the subcontract was signed, establish that Kimberly did not rely on the contract documents to estimate the amount of SRF on site. *Id.* at 15. Likewise, for example, Kimberly's subcontract bid was "only half of the [amount] of the [bids submitted by the] other prospective earthwork subcontractors[,]" indicating that Kimberly's estimate was unreasonable. *Id.* at 14.

Therefore, the Government concludes that Plaintiff acted in "reckless disregard" for the truth or falsity of the SRF claim. *Id.* at 21–22. The Government contends that this was further evidenced by concerns about Kimberly's portion of the April 5, 1996 REA expressed by T.A. McMullen Consultants, Inc. ("the McMullen Firm"), a consulting firm hired by THC to assist in preparing the April 5, 1996 REA and analyze Kimberly's Miller Act claim.[5] *Id.* at 20–21. Specifically, a May

---

5. On March 31, 1997, Kimberly filed a claim against Kvaerner Construction, Inc., parent company of THC, under the Miller Act, 40 U.S.C. § 3133 *et seq.,* in United States District Court for

the Southern District of West Virginia. *See* DX 2, file 4 "Thichnor letter" at 2; PX 70 at 4; *see also* 40 U.S.C. § 3133(b) (providing a right of action for a sub-contractor on a payment bond

15, 1997 letter from Tom McMullen, the McMullen Firm's Chief Executive Officer, asserts that Kimberly's bid was "grossly inflated" and "overstated and irresponsible." *Id.* at 18, 20. Based on this assessment, Mr. McMullen recommended that:

> Under no circumstances should THC certify the REA with the Kimberly REA included in its present form.... I sincerely believe that if Trafalgar/Kvaerner advises Kimberly ... on how to answer the audit they could become a part of assisting Kimberly in the preparation of a fraudulent claim.

*Id.; see also Trafalgar House I,* 73 Fed.Cl. at 685 n. 3, 687 n. 4.

Moreover, Plaintiff did not provide the May 15, 1997 letter, or any of the reports prepared by the McMullen Firm, to Mr. Ross Dionne, Plaintiff's damages expert. *Id.* at 22. This leads the Government to conclude that Plaintiff "supported [the SRF] claim with expert testimony that [Plaintiff] manipulated by hiding key facts with regard to the nature and problems of the claim." *Id.*

### b. The Plaintiff's Response.

Plaintiff responds that the Government failed to introduce sufficient evidence that Kimberly's portion of the April 5, 1996 REA was fraudulent or that Plaintiff "knowingly" submitted a false claim by including Kimberly's claims with the April 5, 1996 REA and the August 20, 1998 REA. *See* Pl. Opp. at 5. In addition, the Government's reliance on the May 15, 1997 letter is misplaced, because the author, Mr. McMullen, was never called as a witness.

> [Mr. McMullen's] qualifications, if any, to make those statements, his basis and rationale for doing so, and whether the nature of his advice, even if it is accepted that it was valid at the time given, changed over time, is simply unknown. Absent such context, the letter is evidentially insuffi-

cient to support a finding that Kimberly's 1996 claim was false or fraudulent.

*Id.* at 4–5.

Moreover, Mr. McMullen did not review any of the records subject to the Government's audit report, nor did Mr. McMullen's May 15, 1997 letter cite any findings by the Government auditors that Kimberly's claims were, in fact, false or fraudulent. *Id.* at 5–6. Therefore, Plaintiff argues that the May 15, 1997 letter only expresses Mr. McMullen's subjective belief that Government auditors *might* find Kimberly's portion of the April 5, 1996 REA fraudulent. *Id.* Plaintiff also argues that the credibility of Mr. McMullen's May 15, 1997 letter further is undermined by the pending Miller Act litigation between THC and Kimberly and the fact that the Government did not proffer the audit on which Mr. McMullen based his conclusions, nor call any witnesses from Tichenor & Associates, the firm that was hired by the Government to perform the REA audit. *Id.; see also* DX 2, file 4 "REA Audit Report" at 1.

In addition, Plaintiff argues that THC never would have agreed to pay Kimberly $3.5 million to settle the Miller Act claim, if it had any doubts regarding the validity of Kimberly's claim. *Id.* at 7. Therefore, the "Liquidating Agreement" between the parties settling that claim evidences that "as of May 26, 1998, [Plaintiff] had every reason to believe, and did believe, that Kimberly's claim was valid and accurate, and that [Plaintiff] acted on that belief." *Id.* at 8. Plaintiff points out that the Liquidating Agreement was entered on the advice of the same counsel, Mr. Joseph McManus, who received the May 15, 1997 letter from Mr. McMullen detailing concerns about Kimberly's portion of the REA. *Id.* at 8–9. If those concerns were valid, Plaintiff would not have entered into the Liquidating Agreement. *Id.* at 9.

Finally, Plaintiff's damages expert, Mr. Dionne, "independently satisfied himself that Kimberly's portion of the claim was sufficiently supported," by "trac[ing] costs back to the source documents and the actual origi-

---

against the prime contractor). The Miller Act claim was settled on May 26, 1998 by THC paying Kimberly approximately $3.5 million and both parties agreeing to jointly pursue any claims

against the Government arising from the Jobs Corps Center construction project. *See* DX 2, file 11 "Liquidating Agreement THC–KII et al" at 5–7.

nal books of entry." *Id.* Likewise, the Government's damages witness, Mr. McTyre, never "question[ed] the good faith basis of Kimberly's portion of the claim, nor did he suggest that either Kimberly or THC's costs were not properly supported by documents and appropriate data." *Id.*

### 3. The Court's Resolution.

As discussed herein, the Government failed to establish two of the requirements of the False Claims Act.

### a. Plaintiff Presented A Claim For Payment To An Agent Of The United States.

The parties do not dispute that Plaintiff submitted a claim for payment to the DOL seeking reimbursement for the import of SRF. *See Trafalgar House I,* 73 Fed.Cl. at 693; *see also* PX 67a at I–3 (August 20, 1998 Joint Claim of Kimberly Industries, Inc. and Trafalgar House Construction, Inc. Job Corps Center, Charleston, West Virginia requesting additional compensation for a "Major Underrun of Special Rock Fill Material"). Accordingly, the first element of the False Claims Act is satisfied.

### b. The Government Failed To Prove That Plaintiff's Special Rock Fill Claim Was False Or Fraudulent.

Previously, the court determined that Plaintiff failed to establish a Type I differing site condition regarding the amount of SRF on the site, because "the information describing the type and amount of special rock fill in the Contract, incorporating the geotechnical reports by reference, did not differ materially from those encountered during performance." *See Trafalgar House I,* 73 Fed.Cl. at 703. In addition, "the conditions encountered were foreseeable," because of the express disclaimers contained in the geotechnical reports, as well as the fact that the Government "neither prohibited nor took any steps to impede [Plaintiff]'s retaining an independent expert to conduct further tests about the site prior to bidding." *Id.* at 703–04; *see also* PX 1, part 5 at 276/359; PX 1, part 6 at 25/121 (geotechnical report disclaimers). The court also determined that

Plaintiff failed to justify use of a "total cost methodology" and declined to award damages for this claim. *Id.* at 704; *see also Servidone Constr. Corp. v. United States,* 931 F.2d 860, 862 (Fed.Cir.1991) (holding that the total cost method for determining damages is only appropriate in "extraordinary circumstances" where there is "no other way to compute damages").

Plaintiff's failure to establish a Type I differing site condition claim *ipso facto,* does not evidence that Plaintiff submitted a false or fraudulent claim. That determination involves a "fact specific reasonableness determination." *See Crane Helicopter Servs. v. United States,* 45 Fed.Cl. 410, 434–35 (1999) (citing *United States v. Seay,* 718 F.2d 1279, 1286 (4th Cir.1983), *cert. denied,* 467 U.S. 1226, 104 S.Ct. 2677, 81 L.Ed.2d 873 (1984)). Here, the decision of the United States Court of Appeals for the Federal Circuit in *Commercial Contractors Inc. v. United States,* 154 F.3d 1357 (Fed.Cir.1998) is particularly instructive. In that case, a contractor asserted a differing site condition claim after submitting a bid that assumed, based on contract specifications, that there would be a five foot clearance between the work site and a nearby retaining wall. *Id.* at 1367–68. In fact, the clearance between the wall and the work site was approximately three and one-half feet, requiring the contractor to use a special, more expensive, form system for the construction of concrete channel segments. *Id.* at 1368. After trial, the United States Court of Federal Claims determined the False Claims Act was violated "because [the contractor] should have known about the narrow clearance when it submitted its bid[.]" *Id.* In upholding the trial court, the Federal Circuit specifically cited testimony of the contractor's President and owner "admit[ing] ... that the contract drawings showed that the clearance was 'basically three feet.'" *Id.* Based on this admission, our appellate court concluded that the contractor "knowingly submitted false claims for extra work due to a differing site condition[,]" because "the contract made clear that [the contractor] would *not* be able to use its regular form system in the area of the retaining wall." *Id.*

In this case, the contract documents did not indicate a precise quantity of SRF that

would be found on site, only that some amount of SRF would be available. *See* PX 1, part 6 at 8–12/121 (Supplemental Geotechnical Investigation advising: "We anticipate that rock removed from the deeper excavations within the upper portions of the site will be used as special rock fill to construct the sidehill fills."). Consequently, Plaintiff had to estimate the amount of SRF that would be available in order to submit a bid. Although hindsight has shown that Plaintiff's estimate was not accurate, it was not in direct contravention of clear contract specifications. *See Commercial Contractors Inc.,* 154 F.3d at 1368. Furthermore, Plaintiff's assumption was not so unreasonable, given the information in the contract documents, as to rise to the level of a false claim.

As to Plaintiff's damages report, Mr. Dionne, a certified public accountant, testified that he found Kimberly's damages claims and use of a total-cost methodology to be reasonable, in light of the fact that Kimberly's accounting system made "[t]he ability to isolate costs ... impossible based upon the stacking of trades, the differing site conditions and just the full breath and scope of work." TR 953–59. Although the court determined that Plaintiff's use of a total-cost methodology was not allowed under relevant precedent, Mr. Dionne's opinion confirms Plaintiff's good faith basis for using this method. *See Trafalgar House I,* 73 Fed.Cl. at 700–01; *see also Servidone Constr.,* 931 F.2d at 862 (holding that the total cost method of computing damages should only be used when there are "extraordinary circumstances" and there is "no other way to compute damages[.]"). Accordingly, the court has determined that the Government failed to establish that Plaintiff's SRF claim was false or fraudulent. *See Young–Montenay, Inc.,* 15 F.3d at 1043 (listing the elements for establishing a claim under the False Claims Act).

### c. The Government Also Failed To Establish That Plaintiff's Special Rock Fill Claim Was Submitted With "Reckless Disregard" Of Its Truth Or Falsity.

In this case, the Government primarily relies on concerns expressed by the McMul-

len Firm about Kimberly's Portion of Plaintiff's April 5, 1996 REA to establish that Plaintiff's SRF claim was submitted with "reckless disregard of its truth or falsity":

> Under no circumstances should THC certify the REA with the Kimberly REA included in its present form.... I sincerely believe that if Trafalgar/Kvaerner advises Kimberly ... on how to answer the audit they could become a part of assisting Kimberly in the preparation of a fraudulent claim.

*Id.* at 20 (citing May 15, 1997 letter from the McMullen Firm to Mr. McManus); *see also Trafalgar House I,* 73 Fed.Cl. at 685 n. 3, 687 n. 4.

The McMullen Firm appears to have been charged with creating a record against Plaintiff in the Miller Act litigation. *See* DX 2, file 8 "Richard Boardman Deposition" at 9 (Richard Boardman, author of two of the three McMullen Firm reports cited by the Government, stating "[M]y client was being sued by the subcontractor, and I was retained by counsel to write an aggressive rebuttal to that subcontractor [and] I took the most aggressive stance that I could support[.]"). Therefore, the McMullen Firm's concerns about Kimberly's portion of the April 5, 1996 REA do not rise to the level of demonstrating that Plaintiff's SRF claim was filed with "reckless disregard" of its truth or falsity. At most, the May 17, 1997 letter, and the other reports prepared by the McMullen Firm, posit conclusory opinions about the validity of Kimberly's portion of the April 5, 1996 REA. *See Trafalgar House I,* 73 Fed.Cl. at 685 n. 3, 687 n. 4. Moreover, the Government never entered into the record any evidence as to the factual basis underlying those conclusions. This oversight is significant.

In addition, there is no direct evidence in the record that Plaintiff ignored the McMullen Firm's reports. For example, Plaintiff settled the Miller Act claim for a $3.5 million payment to Kimberly. *See* TR 933. As part of the settlement, the parties entered into a Liquidating Agreement to pursue their

claims against the Government and split any recovery, based on an established formula. *See* DX 2, file 11 "Liquidating Agreement THC–KII et al" (Liquidating Agreement). The Agreement provided that: "[Kimberly] ... warrants and represents [that its claim has been made in good faith; that the supporting data are accurate and complete to the best of Kimberly's knowledge and belief and, that the requested amount accurately reflects the adjustment to which Kimberly believes it is entitled from the DOL] as to its claims and further agrees to promptly and fully certify its claims in accordance with applicable Federal Acquisition Regulation and/or other law when and as requested by [Plaintiff]." *Id.* ¶ 17. Attached to the Liquidating Agreement is a proposed Joint Stipulation of Dismissal signed by THC's counsel, Mr. Joseph McManus. *Id.* at 24. Mr. McManus also was the recipient of Mr. McMullen's May 15, 1997 letter expressing concern over the validity of Kimberly's claims. *See* DX 2, file 11 at 9–10. Therefore, Mr. McManus's willingness to allow his client to enter into the Liquidating Agreement implies that concerns raised by the McMullen Firm were resolved to Plaintiff's satisfaction.

Although the CO's May 14, 1999 Final Decision expressed reservations about the merits of Kimberly's portion of the claim, the CO also did not directly attack its bona fides. *See* PX 70 at 17, 19. In addition, at trial, neither the CO, nor Mr. McTyre asserted that Kimberly's portion of the claim was false or fraudulent; they only took issue with the recoverability of certain costs, as well as the manner in which Plaintiff calculated damages. *See* TR 1068–69 (CO testifying that he didn't "believe that [Plaintiff] [wa]s entitl[ed] for special rock fill as a differing site condition ... [b]ecause it was unclassified and contract documents did not classify a figure or quantity [of SRF]."); *see also* TR 1172 (Mr. McTyre testifying that Plaintiff was not entitled to recover on the SRF claim). Furthermore, Mr. Dionne prepared Plaintiff's damages report based on his review of the source documents for each claimed payment. *See* TR 833–45 (Mr. Dionne testifying about how his expert report was prepared). Plaintiff's failure to provide Mr. Dionne with information about the McMullen Firm's conclu-sions does not undercut Mr. Dionne's report, since it was based on the underlying source documents. *See* TR 832–43. Although the court ultimately disagreed with Mr. Dionne's opinion about Plaintiff's damage methodology, Plaintiff's SRF claim was consistent with underlying financial records. *See UMC Elec. Co.,* 43 Fed.Cl. at 794 ("The case law stands for the proposition that a failure to make a minimal examination of records constitutes deliberate ignorance or reckless disregard[.]" (citing *TDC Mgmt. Corp.,* 24 F.3d at 298)).

The Government also argues that the circumstances surrounding the negotiation and signing of the earthwork subcontract between Plaintiff and Kimberly evidence intent to defraud. *See* Gov't PT Memo. at 22. The terms of the draft subcontract required that the subcontractor independently "investigate[ ] the nature and locality of the Work and the Project site and the conditions and difficulties under which the Work shall be performed," and disavow express reliance upon any "opinions or representations of the Contractor [or] Owner," such as those provided in the contract documents. *Id.* at 19; *see also* PX 81 at 2. The final subcontract, signed on June 9, 1995, however, deleted the language that the subcontractor did not rely on the "opinions or representations of the Contractor [or] Owner[.]" *See* PX 81 at 2, 10. Since Kimberly encountered problems at the construction site almost immediately after commencing work, the Government argues that this change is a *post hoc* "alteration of the subcontract language[,]" demonstrating that Kimberly was fraudulently manipulating the contract language to bolster the legal basis for the SRF claim. *See* Gov't PT Brief at 19.

The court found that on April 10, 1995, the parties agreed that Kimberly would be awarded the earthwork subcontract and commence work, even though the final terms of the subcontract were being negotiated. *See Trafalgar House I,* 73 Fed.Cl. at 682–83. The court also found that on July 9, 1995, the parties executed a subcontract incorporating the negotiated changes. *Id.* at 683; *see also* TR 403–27. Based on these findings, the court does not discern intent to defraud. If Plaintiff and Kimberly modified the terms of

the earthwork subcontract to improve the legal basis for Kimberly's differing site condition claim, they needed to modify or delete other relevant clauses. For example, the July 9, 1995 subcontract still required Kimberly to conduct an independent assessment of the site conditions:

> Subcontractor further represents to have fully investigated the nature and locality of the Work and the Project site and the conditions and difficulties under which the Work shall be performed and that it enters into this Subcontract Agreement *based on its own independent examination, investigation and evaluation of all relevant details* of the Work.

PX 81 at 2 (emphasis added).

This provision obligated Kimberly to examine all relevant details regarding the earthwork. Furthermore, the June 9, 1995 subcontract also states:

> This Subcontract Agreement, the provisions of the General Contract and the other Contract Documents are intended to supplement and complement each other and shall, where possible, be thus interpreted. If, however, any provision of this Subcontract Agreement irreconcilably conflicts with a provision of the General Contract and the other Contract Documents, *the provision imposing the greater duty or obligation on the Subcontractor or Contractor shall govern.*

PX 81 at 2 (emphasis added).

This provision limits the impact of any terms that might be included in the earthwork subcontract. Regardless of the subcontract language, both parties remained subject to the express disclaimers contained in the geotechnical reports [6] that were incorporated

into the original contract between Plaintiff and the Government. *See Trafalgar House I,* 73 Fed.Cl. at 703.

The court agrees with the Government that the negotiating process employed by Plaintiff and Kimberly was far from a model of best contracting practices, but has determined that, based on the entire record, their conduct was not in "reckless disregard" of the truth or falsity of the SRF claim. *See* 31 U.S.C. § 3729(b)(3).

### d. The Court Need Not Consider Whether The Government Suffered Damages In This Case.

Since the court has determined that the Government failed to prove two of the elements necessary to establish a violation of the False Claims Act, the Government's Second Counterclaim is denied and the court does not need to consider whether the United States suffered damages as a result of the submission of the false or fraudulent claim. *See Young–Montenay, Inc.,* 15 F.3d at 1043.

### III. CONCLUSION.

For the above stated reasons, the Clerk of the United States Court of Federal Claims is directed to enter a Final Judgment: denying and dismissing Plaintiff's breach of contract claims; granting the Government's First Counterclaim to recoup $1,000,000, plus interest; and denying and dismissing the Government's Second Counterclaim, filed under the False Claims Act.

**IT IS SO ORDERED.**

---

6. The Initial Geotechnical Report and Supplemental Geotechnical Report both contained the following disclaimer and warning:

> *The geotechnical report is prepared primarily to aid in the design of site work and structural foundations.* Although the information in the report is expected to be sufficient for these purposes, *it is not intended to determine the cost of construction or to stand alone as a construction specification.* Report recommendations are based primarily on data from test borings made at the locations shown on a boring location drawing included. *Soil variations may exist between borings* and these variations may not become evident until construc-

tion. If significant variations are then noted, the geotechnical engineer should be contacted so that field conditions can be examined and recommendations revised if necessary. The geotechnical report states our understanding as to the location, dimensions and structural features proposed for the site. Any significant changes in the nature, design or location of the site improvements MUST be communicated to the geotechnical engineer so that the geotechnical analysis, conclusions, and recommendations can be appropriately adjusted.

PX 1, part 5, at 276/359; *see also id.,* part 6 at 25/121 (emphasis added).